**In the Matter of HAMLIN'S LANDING JOINT VENTURE, Debtor(s).**

**Bankruptcy No. 87–3826.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Sept. 8, 1987.

Shirley Arcuri, Tampa, Fla., for debtor.

Marsha Rydberg, Tampa, Fla., for Freedom Fed'l S & L.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case commenced on July 15, 1987, by a voluntary petition filed by Hamlin's Landing Joint Venture (Debtor). The matters under consideration are a Motion for Adequate Protection filed by Freedom Federal Savings & Loan Association (Freedom) and Motions to Authorize Use of Cash Collateral and to Fix Salaries of Officers filed by the Debtor. In this connection it should be pointed out that after the Motion for Adequate Protection was filed by Freedom, Freedom was placed under the control of the Federal Savings and Loan Insurance Company (FSLIC). Although no formal substitution has been made, this Court will refer in this opinion to the moving party as Freedom. The original Motions of Freedom and the Debtor were filed promptly after the commencement of the case and were considered initially on an emergency basis. At the conclusion of the hearing this Court entered a preliminary order and authorized the Debtor to use sufficient funds to meet its payroll, which then was to become due in the approximate amount of $25,000.00. At the conclusion of the hearing the Court also announced that the order was merely intended to be a temporary measure and the issues raised by the motions would be considered promptly at an evidentiary hearing to determine to what extent, if any, the Debtor should be permitted to use cash collateral claimed by Freedom.

The underlying facts developed at the evidentiary hearing are largely without dispute as appear from the record and are as follows:

The Debtor is a participant in a joint venture composed of a corporation known as Reconstruction Group of Pinellas, Inc., and Hamlin's Partners, Ltd., a limited partnership, in which an entity known as Narrows Development, Inc., is the general partner. The Debtor was formed in 1984 for the purpose of acquiring and then developing a tract of land located in Pinellas County bordering on the intercoastal waterway as a complex multi-use center composed of a retail shopping center, a marina, and as originally planned, townhouses to be sold as condominiums. Shortly after its formation the Debtor obtained a commitment for a construction loan from Southside Savings and Loan of Lima, Ohio (Southside), an out-of-state Savings and Loan Association, in the total amount of $13,000,000.00, but because of the financial demise of Southside, this commitment did not materialize and was never translated into an actual consumated loan.

The Debtor, having found itself in need of immediate financing, approached and requested a loan from Freedom, who ultimately agreed to lend to the Debtor $14,-200,000.00. This loan was secured by the first mortgage on the real estate; by a collateral assignment of all rents, issues

and profits; and by a security interest in all tangible properties, fixtures, equipment, and also in all intangible properties of whatever kind owned or thereafter acquired by the Debtor. It is not disputed that this is a single-asset case and all assets of the Debtor are encumbered in favor of Freedom to secure the original indebtedness. In addition, the Debtor by § 8.05 of the Loan Agreement (Freedom Exh. # 1) pledged a savings account to be maintained with Freedom in the original principal amount of $1,000,000.00 less all amounts which were permitted to be withdrawn by the Debtor, but only with consent of Freedom. It is without dispute that due to several withdrawals by the Debtor, some with and some without Freedom's consent, the current balance on this savings account has been reduced to $104,000.00. The loan agreement further provided that $250,000.00 of the principal amount loaned would be retained as an interest reserve and may be used by Freedom in case the Debtor was unable to service the obligation. The principal obligation carries a floating interest rate which currently stands at approximately 10% per annum. The interest accruing is $4,237.00 per day or $127,000.00 per month. The current outstanding obligation on this loan stands at $14,888,960.00.

It is without dispute that no interest has been paid by the Debtor to Freedom since January 31, 1987, thus, at the time of the hearing, there was a pre-petition default of five months and there is at least one month post-petition default. It is equally without dispute that the ad valorem taxes assessed against the property have not been paid for the tax years 1985 and 1986.

Freedom, in order to enforce its rights under the Loan Agreement, filed a foreclosure action in the Circuit Court in and for Pinellas County and promptly filed a Motion for Appointment of a Receiver. The Motion was scheduled to be heard July 29, but because of the intervention of the Chapter 11 and the operation of the automatic stay all further proceedings in the foreclosure came to a halt. At the time the matter was originally heard Freedom had not filed a Motion for Relief From the Automatic Stay, although such motion was, in fact, filed July 25, the day before the rescheduled hearing. The Motion, however, was not considered at that time, and this opinion will not deal with that Motion at all, and that matter will be considered later in a separate opinion

The project at this time consists of a three-phase operation. Phase I is the retail shopping center with 20 rentable stores, out of which two are currently occupied and operated by the Debtor and 14 are rented to tenants. Phase II of the operation involves a hotel which was originally constructed as townhouses intended to be sold as condominiums, but is currently being operated as a hotel facility. Phase III is a marina where the Debtor rents slips to boats and also renders miscellaneous services to the public related to boating. The Debtor operated the project to a limited extent prior to September, 1986. It had its grand opening of the project on Labor Day of 1986. The prospects of this project are not rosy at this time, to say the least. Because of the dispute which arose between Freedom and the Debtor, some tenants, having become apprehensive that they would be exposed to double jeopardy by paying the rent to the Debtor, commenced an interpleader action in the Circuit Court in and for Pinellas County and placed in the registry of the Court the sum of $16,254.48. It further appears that during its almost one-year operating history the maximum monthly gross revenues derived from project was less than $160,000.00 achieved in March in 1987. The current cash flow generated from the project is slightly in excess of $100,000.00.

There is hardly any question that the revenue generated by the project at this time has a shortfall of at least $20,000.00 per month without providing for debt service, which runs at the rate of $127,000.00 per month without payment of anything on the principal. Thus unless the Debtor is permitted to have access either to at least the general operating account or possibly to the savings account, it is clear that it will not be able to meet its current operating expenses.

The cash collateral involved in this controversy and claimed by Freedom consists of the rents and profits derived from the operation of the project; the balance in an operating checking account maintained at Freedom by the Debtor on which there is a current balance of $121,000.00; and the sum of $104,000.00, which is currently in a savings account maintained for the Debtor by Freedom.

In order to escape the inevitable, the Debtor contends first that the rents and profits derived from the operation of the project are not "cash collateral" within the meaning of that term and, therefore, are not covered by § 363(a) of the Bankruptcy Code which deals with cash collateral; second, that even assuming but not admitting that the funds involved in this controversy or some of the funds qualify to be cash collateral, Freedom is not entitled to any adequate protection under § 363(e) because of a substantial equity the Debtor has in this project.

In addition, it is the contention of the Debtor that in any event Freedom is not entitled to anything more than it would have received, absent the Bankruptcy, in the state court foreclosure action; therefore, it is not entitled to adequate protection pursuant to § 363(e) of the Bankruptcy Code.

The basic and threshold question is, of course, whether or not the funds the Debtor intends to use, i.e. the rents and profits derived from the operation of the project and the funds in the operating account and in the savings account are, as a matter of law, deemed to be "cash collateral" and thus entitled to the protective provisions set forth in § 363(e) of the Bankruptcy Code. The term "cash collateral" is defined by § 363 of the Bankruptcy Code which reads as follows:

11 U.S.C. § 363. Use, sale, or lease of property

(a) In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

### Debtor's Rights to Use Rents and Profits

■ Regarding the rents and profits it is the contention of the Debtor that these funds cannot, as a matter of law, constitute "cash collateral" because Freedom does not have any interest in them as is required by § 363(a). In support of its proposition the Debtor contends that the rights of a mortgagee to rents, issues and profits derived from mortgaged property are governed by the applicable local law, and under the laws of this State the mortgagee is not entitled to any of the rents, profits or issues derived from the mortgaged property unless the mortgagee obtains an order of sequestration of the rents or obtains actual possession of the property directly or through an appointment of a receiver.

These propositions urged by the Debtor are indeed well established and there is no question that whether or not a mortgagee is entitled to rents and profits derived from the mortgaged property must be determined with reference to the applicable state law; *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Casbeer*, 793 F.2d 1436 (5th Cir.1986); *In re Village Properties, Ltd.*, 723 F.2d 441, 443 (5th Cir.1984); *In re Morning Star Ranch Resorts*, 64 B.R. 818 (Bankr. Colo.1986).

Neither independent research nor research of counsel found any authority to the contrary that in the State of Florida a mortgagee is not entitled to any of the rents and profits derived from the property unless the mortgagee obtained an order of sequestration or actually took possession of the subject property either by consent or by the appointment of a receiver. *See Carolina Portland Cement Co. v. Baumgartner*, 99 Fla. 987, 128 So. 241 (1930); *In re Parham*, 72 B.R. 604 (Bankr.M.D.Fla.

1987); This is not only the law of the State of Florida, but is also well established in other jurisdictions. *See In re Casbeer, supra,* which dealt with the identical question applying the law of Texas.

Since it is without dispute that in this instance Freedom never obtained an order of sequestration nor the appointment of a receiver, Freedom does not have an interest in any of the rents and profits derived from the operation of the project. This being the case, it is clear that the rents and profits derived from the operation of the project do not qualify to be "cash collateral" simply because before "cash collateral" comes into play there must be cash or the equivalent of cash in which the estate and the entity other than the estate have an interest. From all this, it follows that § 363(e) which requires adequate protection for the use of cash collateral is not applicable at all, and the Debtor should be permitted to use the rents and profits subject, of course, only to the usual control and supervision by the Court of all expenditures by Debtors-In-Possession unless some other provision of the Bankruptcy Code would require a different result.

In this connection Freedom points out that § 546(b) of the Bankruptcy Code provides that if in order to perfect an interest in collateral, it is necessary that the secured party takes possession or sequester the subject property, and the secured party is prohibited from doing so because of the intervention of the bankruptcy, it is entitled to perfect its interest post-petition by giving notice. This section provides as follows:

§ 546. *Limitations on avoiding powers*

(b) The rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. If such law requires seizure of such property or commencement of an action to accomplish such perfection, and such property has not been seized or such action has not been commenced before the date of the filing of the petition, such interest in such property shall be perfected by notice within the time fixed by such law for such seizure or commencement.

Relying on this Section it is the contention of Freedom that the day before the hearing Freedom, in fact, gave notice and therefore perfected its right to the rents and profits, at least in the future rents and profits derived from the operation of the project. Therefore, Freedom argues that the Debtor should not be permitted to use and utilize the rents to be collected and the profits derived from the project unless it furnishes adequate protection pursuant to § 363(e) of the Bankruptcy Code.

At first blush it appears that this Section was designed to permit mechanic's lienors who are prevented from perfecting their liens on properties by the intervention of bankruptcy to do so by giving the requisite notice. The legislative history of this Section is unclear and fails to furnish any specific guidelines as to the exact reach of the section of the Code. However, case law interpreting this Section concluded that a mortgagee may perfect its interest in rents and profits post-petition by giving a notice of its intention to do so. *See In re Morning Star Ranch Resorts, supra; In re Colter, Inc.,* 46 B.R. 510 (Bankr.Colo. 1984). It is without dispute as noted earlier, that in this case Freedom did, in fact, file such notice the day before the hearing.

The difficulty with the position urged by Freedom should be evident, however, when one considers the operation of the automatic stay imposed by § 362 of the Bankruptcy Code which comes into operation upon the commencement of a case as it relates to the post-petition perfection of an interest in the property of the estate seemingly authorized by § 546(b) of the Code relied on by Freedom.

Section 362(a) prohibits the commencement or continuation of any act to obtain possession of property of the estate or any act to create, to perfect, or to enforce any lien against property of the estate. While it is true that Freedom did in fact originally

file a Motion and sought relief from the automatic stay, it sought relief from the stay only for the limited purpose to proceed to enforce its alleged set off rights against the funds in the savings and operating accounts of the Debtor pursuant to § 553(a)(3) of the Bankruptcy Code and did not seek relief from the stay in order to obtain permission to perfect a lien on property of the estate, i.e. on the rents and profits derived from the operation of the project.

Based on the foregoing this Court is satisfied that as Freedom did not perfect a lien on the rents and profits, prior to the commencement of this Chapter 11 case, the Debtor shall at this time, at least temporarily, be permitted to use all rents and profits derived from the project with the proviso that the Debtor pays nothing but the bare minimum operating expenses needed to maintain all current operating expenses of the project.

In support of its Motion for Authority to use Cash Collateral, the Debtor submitted a projection of a proposed budget. Having reviewed the projected budget, this Court is satisfied that the Debtor shall not expend any funds except for the payment of the following items:

First, all necessary and reasonable direct operating expenses of the project consisting of payroll, utilities, all taxes relating to the operation, which include not only payroll taxes but sales taxes, and all costs of insurance, to the extent it appears to be necessary after the current policy procured by Freedom expires or is cancelled. Payment for all the other items submitted by the Debtor in its budget as appear on Exhibit 3, which in this Court's judgment are capital expenditures, shall be deferred pending some other additional persuasive showing by the Debtor that the expenditures are justifiable as a matter of sheer economics and common business sense.

There are two items on Exhibit 3 which warrant a short discussion. One of the items on which the Debtor intends to spend funds relates to furnishing nine additional bedroom suites at $7,000.00 each. The total cost of this project is stated to be $63,-000.00. In support of this proposition the Debtor urges that these units when furnished would be additional revenue producing units which during the upcoming season would produce an additional revenue of $195.00 each day. The difficulty with this proposition is obvious when this Court considers the realities of the situation, notably the level of occupancy of the hotel operation. While it might be true that nine additional rooms conceivably would produce some additional revenues during the oncoming season considering the rate of occupancy of the hotel facility at this time and the past performance of the hotel operation, pending a further pursuasive showing of the economic soundness of this proposition, there is no assurance that these nine additional rooms could be rented in the near future to produce sufficient income to recoup the initial investment required to implement this project. Be that as it may, this expenditure should be deferred at this time.

The Debtor also proposes to complete six slips in the marina facility pointing out that there are six approved slips, but the permits for these slips would expire August 30, 1987. This Court is satisfied that this is also an item which should be considered later on and should not be authorized at this time.

In addition, the Debtor has proposed to enter into a joint venture agreement with a cafeteria known as "The Bank". This would require an expenditure by the Debtor to build up the facility to accomodate this cafeteria. The details of this joint venture are not before this Court. Therefore, it would be inappropriate at this time even to consider the same without having the benefit of all the relevant information necessary to judge the economic soundness and feasibility of this proposition before funds should be expended for this venture.

*Debtor's Right to Use Funds on Deposit In General Operating Account*

■ It is axiomatic and well established that the relationship between a depositor and a banking institution is a relationship of a creditor and a debtor, and the funds on

deposit are not properties of the depositor who merely has a claim against the institution in which the funds are deposited. *In re Williams*, 61 B.R. 567 (Bankr.N.D.Tex. 1986). This being the case, it is clear that the Debtor's interest is limited to a claim against Freedom to the extent the funds are on deposit. However, despite these fundamental principles of banking law, § 363 of the Bankruptcy Code clearly provides that "deposit accounts," which would include a general operating account, constitute cash collateral. Therefore, regardless of the commonlaw right of set off now codified by § 553 of the Bankruptcy Code that comes into play when the institution has a claim against a depositor, which is the case in the present situation, the Debtor may request permission from this Court to use cash collateral at least until the institution seeks to exercise its right of set off. Freedom has filed a Motion seeking permission to exercise the right of set off, and that matter is currently under advisement by this Court pending submission of authorities determining under what terms and conditions this right should be permitted to be exercised in the present instance. For this reason this opinion will not deal with that problem; it will be dealt with by a separate Order to be entered on the Motion for Relief from the Stay. Pending a determination on Freedom's right of set-off, however, this Court will consider the Debtor's right to use the funds on deposit in the operating account.

In arguing that it should be permitted to use the funds in the operating account, the Debtor contends that due to the large equity in the property, Freedom's interests in the operating account are adequately protected. In support of its proposition the Debtor cites *In re George Ruggiere Chrysler Plymouth, Inc.*, 727 F.2d 1017 (11th Cir.1984), where the Court of Appeals for this circuit concluded that the determination of the measure of adequate protection in connection with the use of cash collateral must be made without reference to the cash collateral, and the Court shall only consider the secured party's interest in collateral held by the secured party other than the cash collateral. To put it in another way, the Debtor contends that the large equity alone would be sufficient to serve as adequate protection, and the fact that it might use up the cash collateral is irrelevant.

The evidence presented on the equity in the property was not the testimony of the appraiser who actually appraised the subject property, but an appraiser who had reviewed an appraisal made by some other appraiser who was not presented and did not testify. For this reason this testimony should be taken with great caution because the value presented to this Court by this witness was not based on his own investigation and inspection and appraisal, but merely on someone else's, which presupposed the validity of the underlying premises and assumptions made by the appraiser who actually appraised the subject property.

In this connection it should be pointed out that the value arrived at, that is, the sum of $19,000,000.00, was arrived at by the appraiser considering the income-producing capability of this project, which was considered to be $19,600,000.00, and by using the cost approach, which was stated to be $19,360,000.00. Based on these numbers, the ultimate conclusion of the original appraiser was that the property is worth today $19,600,000.00 and when fully developed between $26,000,000.00 and $29,000,-000.00. The fallacy of the opinion of the original appraiser should be evident when one considers the fact that his value based on the income approach was not based on empirical data at all but on a postulate that the project will throw off a gross income in the future of monthly revenues in excess of $200,000.00, a number totally unsupported by historical data. As noted earlier, the best month this project ever experienced was in March, 1987, at which time the revenues were between $140,000.00 and $160,000.00. Thus, there is nothing in this record which warrants at this time acceptance of the validity of these assumptions. Be that as it may, since there is no contrary evidence on record, while the value stated is questionable, for the purposes of discussion this Court accepts the proposi-

tion that this Debtor does have equity in the subject property.

In addition, it is contended by the Debtor that Freedom is only entitled to receive the measure of protection which it would have received outside of bankruptcy had it been permitted to proceed with its forclosure action. In this connection, the Debtor points out that had Freedom obtained an appointment of a receiver, the receiver would no doubt be permitted to operate the project, and conceivably could have applied for and would have obtained permission from the state court to have access to the funds in the operating account to meet any shortfall and to maintain the operation of the business. This being the case, Freedom would be in exactly the same position in a state court foreclosure action.

Based on the evidence presented this Court is satisfied that the continued operation of this project is of paramount importance in order to assure that the going concern value of the project is preserved. Obviously, the project cannot be operated today without permitting the Debtor to use some of the funds in the operating account to the limited extent it is necessary to maintain the operation at the proposed current level and to meet the shortfall, at least temporarily until the economic viability of this project is shown to be nonexistent. Allowing the Debtor to use the operating account to meet the monthly shortfall is in the best interests of Freedom, as well as the Debtor. No one in his right mind, including Freedom, would seriously contend that the most economic approach to salvage this project would be to close it down, put it on the auction block, and sell it as brick and mortar rather than market the same as a going business which, of course, in turn would preserve the good will and its going concern value.

Of course, this Court is not unmindful of the danger of permitting the Debtor to use up the cash collateral prior to the determination of Freedom's right to set off. For this reason as noted above the Debtor's right to use this cash collateral shall be circumscribed to the extent it is necessary to meet any shortfall for current operating expenses, and the Debtor will be under the strict control of this Court, as are all Debtors-In-Possession.

In this connection it should be noted that this Chapter 11 is still in an embryonic state and thus it would he premature to ·ring the death knell over this Debtor at this early stage. The Debtor should be given some reasonable opportunity to establish to the satisfaction of this Court that it is able to achieve rehabilitation through the reorganization provisions of Chapter 11.

### Debtor's Right to Use Funds on Deposit in Savings Account

This leads to the next issue, which is the Debtor's access to the savings account in order to meet the shortfall which admittedly exists at this time. There is no question that that the funds on deposit are cash collateral. Further, there is no question that Freedom has a valid perfected security interest in the funds on deposit in the savings account. Since there is nothing in this record which warrants a conclusion that the Debtor should be permitted to use the funds in the savings account, the Debtor shall not be permitted to use any of these funds especially in light of the fact that the savings account was already used to a large measure without consent and authorization in violation of the contract and in light of the fact that Freedom's right to set off is yet to be determined.

### Payment of Officer's Salaries

This leaves for consideration the Motion filed by the Debtor which seeks authority to pay officer's salaries. The request is made on behalf of Mr. and Mrs. Twitty and Mr. Larison. Mr. Twitty seeks weekly compensation of $1000.00, Mrs. Twitty seeks a compensation of $500.00 per week, and Mr. Larison seeks compensation of $750.00 per week. The evidence presented in support of the Motion indicates that both Mr. and Mrs. Twitty are involved on a full-time basis in the affairs of the Debtor, that they are not receiving any income from any outside source, and that their basic minimum budget to maintain their current level is far in excess of

what they are requesting. Considering the current financial plight of this Debtor and considering that Mrs. Twitty represents an ownership interest, this Court is of the opinion that the salaries requested should be authorized at this time, but should be reduced to $950.00 for Mr. Twitty and for Mrs. Twitty $350.00. For Mr. Larison, the compensation shall be $650.00 per week.

A separate final order will be entered in accordance with the foregoing.