**In re TM CARLTON HOUSE PARTNERS, LTD., Debtor.**

**Bankruptcy No. 88–10774S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 4, 1988.

**350**

Joanne Zack, Philadelphia, Pa., for Equity Sec. Holders.

Mark S. Lieberman, Chicago, Ill., Marvin Krasny, Philadelphia, Pa., for Skokie.

Cole Silver, Philadelphia, Pa., for Teebesco.

Geoff Veith, Philadelphia, Pa., for Capital Group.

Martin J. Weis, Lawrence G. McMichael, Philadelphia, Pa., for debtor.

Mark J. Packel, Philadelphia, Pa., for Creditors' Committee.

Stephen Raslavich, Philadelphia, Pa., for Bergs.

David Smith, Philadelphia, Pa., for Concap.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

## AMENDED OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The parties interested in the Debtor's instant motion to continue its right to use cash collateral under the same terms as were agreed upon on April 28, 1988, appear to agree that the issue which we must decide in resolving the motion is whether the rents collected by the Defendant, a partnership operating a structure covering an entire city block in the city of Philadelphia housing about 600 residential and business tenants, is cash collateral subject to the security interest of the second mortgagee of the Debtor's property, SKOKIE FEDERAL SAVINGS & LOAN ASSOCIATION (hereinafter referred to as "Skokie"). A secondary issue which the parties also appear to agree is before us is whether the Debtor is using its cash collateral wisely, and whether we should restrict its use beyond the restrictions already imposed in the April 28, 1988, Order.

We have serious misgivings as to whether Skokie has made an adequate record at the hearing on this motion to meet its burden of proving the validity, priority, and extent of its security, as required by 11 U.S.C. § 363(o)(2). Skokie entered neither its mortgage nor the notice sent to the Debtor which allegedly perfected its security interest in the rents properly into the record. However, the Debtor concedes in its post-trial Brief that "[i]t is not disputed that the Skokie wrap mortgage contains an assignment of rents clause and that on April 1, 1988, counsel for Skokie filed a notice pursuant to 11 U.S.C. § 546(b) in an attempt to perfect their [sic] lien on those rents post-petition." [Debtor's] Supple-

mental Memorandum of Law in Support of Continued Use of Cash Collateral, at 2–3.

Accepting these concessions of the Debtor, we nevertheless hold that Skokie has not established that it has a security interest in any of the rents collected by the Debtor, nor that further restrictions on the use of cash collateral are warranted. We shall therefore direct that the Debtor may continue to use cash collateral, pursuant to our Order of July 19, 1988, subject to the terms set forth on April 28, 1988, through October 24, 1988, the date that the Debtor's exclusivity period pursuant to 11 U.S.C. § 1121(b) expires.

This case was commenced by the filing of an involuntary Chapter 11 petition against the Debtor on March 7, 1988, by three allegedly unsecured creditors of the Debtor. However, by filing an adversary proceeding at Adversary 88–0381S, seeking to enjoin the Debtor from using cash collateral, pursuant to § 303(f), on March 8, 1988, Skokie quickly established itself as the most vigorous of the Debtor's creditors. Although we denied Skokie provisional relief in the Adversary proceeding after a hearing on March 15, 1988, we scheduled a hearing on the involuntary petition on March 29, 1988. The Debtor indicated on that date that it would be filing a consenting answer, which it did on March 31, 1988, at which time we entered an order for relief. Also, on that date, a brief interim cash collateral order was entered by agreement of counsel for all of the multifarious interested parties present, effective through April 28, 1988.

On April 28, 1988, it appeared that Skokie, continuing its role as the most vigorous contestant of the Debtor's current management, would not agree to an order permitting continued use of cash collateral without numerous conditions, some to which the Debtor refused to agree. After hearing the points of difference, we briefly related our own views on these points of difference. The parties thereupon entered into negotiations for agreed terms through July 19, 1988, which were apparently successful, and were dictated into the record later that day.

A hearing to consider whether the cash collateral order should be extended beyond that date was listed on July 19, 1988. We learned for the first time, at *that* hearing, that the apparent agreement of April 28, 1988, had never been reduced to writing because one of the conditions required the Defendant to deposit all of its real estate tax escrow accounts with Skokie, and the United States Trustee had never approved Skokie as a depository for all of these funds of the estate, pursuant to 11 U.S.C. § 345. Also Skokie, joined by CONSOLIDATED CAPITAL EQUITY PARTNERS, the first mortgagee on the Debtor's property (hereinafter referred to as "Concap"), argued that the rents from the realty were cash collateral subject to Skokie's security interest, and that the court should so rule in determining whether to limit the Debtor's use of cash collateral more extensively thereafter than it had in the terms of the April 28, 1988, agreement. The United States Trustee was not present to describe any reservations about Skokie as a depository. Upon the willingness of all parties present to so resolve this impasse in this fashion, we entered an Order directing the Debtor to deposit the entire tax escrow account with Skokie. The United States Trustee apparently subsequently moved that we reconsider this Order, but that matter has been continued several times pending approval of Skokie as a depository.

The only party that presented any witnesses at the July 19, 1988, hearing was the Debtor, who called Thomas A. Cooney, the chief operating officer of General American Equities, a general partner of the Debtor, and Michael Axler, an expert real estate appraiser. Mr. Axler testified that the value of Debtor's realty at present was $44,568,262.00, and that its value was constantly appreciating and would increase to over $48,000,000.00 in a year. Mr. Cooney testified that the Debtor had accumulated over $500,000.00 in cash since the filing and would continue to accumulate about $200,000.00 monthly. However, he testified that the Debtor considered it prudent to retain this cash for costs and fees necessary to refinance the Debtor's present loan structure. At present, Concap was said to hold

a mortgage of about $27 million, bearing interest at ten (10%) percent per annum and eighteen (18%) percent on default; Skokie, a wrap-around mortgage, including a wrap-around assignment of rents, in the principal amount of $44.9 million, including the Concap note, bearing interest at 13.5 percent per annum and twenty (20%) percent upon default; and John G. Berg and Maureen Heverly, a third-position wrap-around mortgage in the principal amount of $50 million, including both prior mortgages, bearing interest at 14.5 percent per annum and sixteen (16%) percent upon default. Delinquent local estate taxes for 1986 and 1987, totalling over $1.5 million, were said to be accruing interest at 19.5 percent per annum. Skokie, joined by Concap, argued that its interest in cash collateral, including the rents, would not be adequately protected unless the Debtor were required to remit payments to Skokie, Concap, and/or the City forthwith, which was not required in the April 28, 1988, agreement, rather than "hoarding" this money.

At the close of the hearing, we ordered that the terms of the April 28, 1988, agreement would remain in effect pending our decision on the motion, and that any interested parties could submit Briefs in support of their respective positions on or before August 2, 1988. Only the Debtor, Skokie, and the Official Unsecured Creditors' Committee (hereinafter referred to as "the Committee"), supporting the Debtor, have opted to do so.

█ The skimpiness of the record is a drawback in addressing the issue of whether Skokie has a valid security interest in the Debtor's rents, and hence whether these rents are indeed Skokie's cash collateral. Skokie's mortgage was "introduced" into the record only by incorporation of its attachment to the Complaint in the since-abandoned Adversary No. 88–0381S in its post-trial briefing. The Notice of Perfection of Security Interest in Rents and Leases in Lieu of Seizure of Property or Commencement of Action Pursuant to 11 U.S.C. § 546(b) (hereinafter referred to as "the Notice") was, by itself, simply filed of record on April 1, 1988. However, neither

of these documents was formally made part of the record on the instant motion. *See In re Aughenbaugh*, 125 F.2d 887, 889 (3d Cir.1942); and *In re Nicolet, Inc.*, 80 B.R. 733, 742–44 (Bankr.E.D.Pa.1987). Introducing these documents into the record here would appear to have been the minimal means by which Skokie could have met its burden of proving the validity, priority, and extent of its security pursuant to 11 U.S.C. § 363(*o*)(2). *Compare In re 1606 New Hampshire Avenue Associates*, 85 B.R. 298, 309–11 (Bankr.E.D.Pa.1988) (hereinafter cited as "*N.H. Ave*"). Only the Debtor's apparent stipulation that we can consider these matters as part of the record here, see pages 350–51 *supra*, presents us with any real basis to conclude that we have a record sufficient to even consider Skokie's position. The drawbacks arising from the deficiencies in the record do, in several specific instances of the interpretation of applicable law, fall upon Skokie.

The parties appear to agree that the primary sources for resolution of the issue of whether the Debtor's rents are Skokie's cash collateral are the prior court decisions in *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re DiToro*, 17 B.R. 836, *reconsidered*, 22 B.R. 392 (Bankr.E.D.Pa.1982); and *Peoples–Pittsburgh Trust Co. v. Henshaw*, 141 Pa. Super. 585, 15 A.2d 711 (1940). *Butner* holds that the rights of a mortgagee in rents due to tenants of a mortgagor are matters of state law. *Henshaw* is a comprehensive essay of Pennsylvania's state law on the subject of the rights of mortgagors, their tenants, and their mortgagees *inter se*. *DiToro* represents the only effort of this court heretofore to grapple with the issue of the rights of such parties.

In addition to § 363, there are two pertinent Code sections. The first is 11 U.S.C. § 552(b), which provides as follows:

(b) Except as provided in section 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the

debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

This Code section appears to be a codification of *Butner's* reliance upon state law, i.e., "applicable nonbankruptcy law," for the general determination of the validity of an alleged security interests in rents. However, the last words of the statute, beginning with the word "except," add an express power to the bankruptcy court to "order otherwise" if the "equities of the case" dictate contrary to state law. Therefore, this Code section represents an attempt to soften slightly the strict adherence to state law directed by *Butner*.

The second relevant Code section is 11 U.S.C. § 546(b), which provides as follows:

The rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. If such law requires seizure of such property or commencement of an action to accomplish such perfection, and such property has not been seized or such action has not been commenced before the date of the filing of the petition, such interest in such property shall be perfected by notice within the time fixed by such law for such seizure or commencement.

However, whether this section applies to security interests in rents at all, as we discuss hereinafter, is a subject of hot dispute.

The *Henshaw* decision, including an encyclopedic discussion of relevant Pennsylvania law on the rights of mortgagors, their tenants, and mortgagees, is, under § 552(b) and *Butner*, the fountainhead of the generally applicable Pennsylvania state law on the subject. The two *DiToro* Opinions, principally the second, rely heavily upon it. It is therefore important to analyze this decision carefully.

The narrow question presented in *Henshaw* was whether a mortgagee, not having been conveyed a security interest in the mortgagor's rents in the mortgage, had a right to demand that a tenant, whose lease with the mortgagor was made after the mortgage, must pay rents to the mortgagee where the mortgagor remained in possession, but after a default by the mortgagor in mortgage payments had occurred. The court affirmed a lower court decision answering the question in the negative. 141 Pa.Super. at 586–87, 15 A.2d at 713.

The court began by distinguishing the facts before it from cases involving leases which preceded mortgages granting a security interest in rents to the mortgagee. In such a case, the court held that the tenant *was* obliged to pay rents to the mortgagee after notice to the tenant. 141 Pa.Super. at 587–89, 15 A.2d at 713–14. However, it also concluded that this holding was not determinative of the issue before it, because there, the mortgage preceded the lease. *Id.*

It then considered the interest of a mortgagor in realty generally and found that a mortgagor in possession "remains the owner of everything not conveyed away by the mortgage," including the right to grant a lease. 141 Pa.Super. at 590, 15 A.2d at 714. Only the mortgagor was said to be in such privity with the lessee as to be able to enforce the terms of a post-mortgage lease. 141 Pa.Super. at 591, 15 A.2d at 715. The court's conclusion, followed by an anti-climatic discussion that this conclusion was not altered by equitable principles, is as follows:

In order to acquire the right to demand payment of the rent to the mortgagee there must be an entry and taking of possession of the mortgagee. Lacking such entry and taking of possession he must proceed by ejectment of "foreclosure" as aforesaid.

If the mortgagor goes into bankruptcy (*Bindseil v. Liberty Trust Co.*, 3 Cir., 248 F. 112, Woolley, J.), or an attachment execution is levied upon the rents in the hands of the tenant, (*Miners Savings Bank v. Thomas*, 140 Pa.Super. 5, 12 A.2d 810), and the rent, in consequence, comes into the custody or control of the law, the priority of the mortgagee will be recognized and the rents distributed to the mortgagee in preference to the general creditors or attaching creditor, as the case may be, at least where the mortgage conveys the rents, issues and profits accruing under subsection leases and the mortgagee gives notice of his demand for their repayment.

141 Pa.Super. at 592–93, 15 A.2d at 715–16.

The principles set forth in *Henshaw* appear entirely consistent with those expressed by the Supreme Court in *Teal v. Walker*, 111 U.S. 242, 248, 4 S.Ct. 420, 423, 28 L.Ed. 415 (1884), as "well settled in this country."

The citation of *Henshaw* to *Bindseil v. Liberty Trust Co.*, 248 F. 112 (3d Cir.1917), for the principle that a bankruptcy filing is the equivalent of an "entry and taking of possession" by the mortgagee might be thought to be significant in the instant bankruptcy context. However, *Bindseil* and the line of Third Circuit cases following it, *e.g.*, *In re Pittsburgh–Duquesne Development Co.*, 482 F.2d 243, 245 (3d Cir. 1973); and *Central Hanover Bank & Trust Co. v. Philadelphia & Reading Coal & Iron Co.*, 99 F.2d 642, 645 (3d Cir.1938), were expressly overruled by *Butner*. 440 U.S. at 48–49, 99 S.Ct. at 914–15. We therefore conclude that the *Butner* ruling effectively eradicated this principle from the annals of Pennsylvania law.

In *DiToro*, the Standing Chapter 13 Trustee was ordered to collect all post-petition rents owed to the mortgagor-debtors as part of a stipulation resolving a motion for relief from the automatic stay filed in their Chapter 13 cases by the Debtors' mortgagee. 17 B.R. at 837–38; 22 B.R. at 392–93. The mortgagee was also given relief from the stay in the event that no sale of the premises took place as of a

certain date. 17 B.R. at 837–38. No sale in fact took place. *Id.* at 838. The mortgagee, given relief from the stay, proceeded to foreclosure in state court. *Id.* The issue before the court was whether the Debtors or the mortgagee had the right to receive the pre-foreclosure rentals in the hands of the Trustee, it being conceded that the mortgagor had the right to post-foreclosure rentals. *Id.* It is not stated anywhere in either opinion whether the leases preceded the mortgage or vice-versa.

Initially, Judge King, deciding *DiToro*, held that the mortgagee's failure to acquire possession of the premises prior to bankruptcy required a ruling that it was not entitled to the pre-foreclosure rentals. 17 B.R. at 838–39. However, on reconsideration, although stating that he was "not entirely in agreement" with the mortgagee's position that the filing of a pre-foreclosure complaint constituted a "constructive" possession of the premises, 22 B.R. at 394, 393, Judge King held that the fact that the rents "were collected and escrowed by the trustee," *id.* at 394, required a change of his prior conclusion. He thus reasoned, in effect, that the trustee's possession placed the rents into "the custody and control of law," one of the situations where the *Henshaw* court recognized that "the priority of the mortgagee will be recognized." 141 Pa.Super. at 593, 15 A.2d at 716. This ultimate disposition of *DiToro* was not surprising, as the facts were closely analogous to those in *Miners Savings Bank of Pittston v. Meyer*, 140 Pa.Super. 5, 12 A.2d 810 (1940), cited by approval in *Henshaw*. In *Miners Savings Bank*, the court held that a garnishment of rents by a judgment creditor other than a mortgagee placed the rents in the custody of the law such that the mortgagee could reach them. However, again, Judge King failed to note whether the lease had preceded the mortgage or vice-versa. And his opinion made no mention of 11 U.S.C. § 546(b).

█ Here, there was clearly no attachment or sequestration of the rents by any party other than the mortgagor, as in *DiToro* and *Miners Savings Bank*. The record contains no indication as to which or

whether any of the Debtor's leases in issue preceded Skokie's mortgage. If they did, *Henshaw* teaches that Skokie would then have a right to demand same from the tenants under state law, and therefore would have a security interest in the rents upon notice to the tenants, unless we find the "equities of the case," per the last clause of § 552(b), to the contrary. However, having failed to meet its burden of proving that any of the leases preceded the mortgage, *see Malamut v. Haines,* 51 F.Supp. 837, 843 (M.D.Pa.1943), we cannot rule in favor of Skokie on that basis. *Cf. N.H. Ave., supra,* 85 B.R. at 309–11. We also observe that Skokie has not established that it provided any pre-petition notice to any of the tenants in any event.[1]

This leaves Skokie with only the arguments that the "equities of the case," per the last clause of § 552(b), command a different result than state law or that 11 U.S.C. § 546(b) allowed it to impose a post-petition, non-possessory security interest in all of the Debtor's rents by the medium of dispatch of the notice. We fail to perceive any special equities supporting Skokie, and note that Skokie itself does not argue that there are any. Though recognizing a split of authority on the issue, we refuse to join those cases which have held that the combi-nation of § 546(b) and Skokie's post-petition dispatch of the notice can have such an impact.

As Collier indicates, § 546(b) was enacted to perpetuate former Section 67(c)(1)(B) of the Bankruptcy Act, which permitted a post-petition perfection of a security interest "if under applicable nonbankruptcy law perfection could relate back to defeat the rights of an intervening creditor." 4 COLLIER ON BANKRUPTCY, ¶ 546.03, at 546–11.

Thus, § 546(b) is said to continue the aforesaid Act policy and expand it only as to the narrow class of parties within the scope of Section 9–301(2) of the Uniform Commercial Code, *i.e.,* holders of unperfected purchase money security interests whose rights also relate back to give priority over a transferee in bulk or a lien creditor which arises in the time between possession and filing. *See id.* and 13 Pa.C.S. § 9301(b).

Legislative history supports this narrow reading of the scope of § 546(b): "The rights granted to a creditor under this subsection prevail over the trustee only if the transferee has perfected the transfer in accordance with applicable law, and that perfection relates back to a date that is

---

1. In a motion for reconsideration of our original Opinion of August 18, 1988, and the order of that date, Skokie argued that the presence of a clause in the mortgage here giving Skokie a broad right to assignment of the rents distinguished the facts here from those in *Henshaw.* While it is true that, in our original Opinion, we erroneously stated that there was a clause granting an assignment of the rents to the mortgagee in *Henshaw,* which we have corrected, we do not believe that the absence of such a clause makes any difference in the reasoning of *Henshaw.* The statements in the principal authority cited by Skokie on this point, *Colbassani v. Society of Christopher Columbus,* 159 Pa.Super. 414, 416–17, 48 A.2d 106, 107 (1946), were clearly dictum and do not make any differentiation on the basis of the presence of a rent-assignment clause. The case involved the right of a judgment creditor to garnish the rents of a tenant, and the court held that the assignment of rents to the mortgagee did not deny the creditor of the remedy of garnishment. The other cases cited by Skokie similarly make the statements relied upon by Skokie to support their position in dictum. *Fogarty v. Shamokin & Mount Carmel Transit Co.,* 367 Pa. 447, 449–51, 80 A.2d

727, 728–29 (1951); and *Randal v. Jersey Mortgage Investment Co.,* 306 Pa. 1, 5–6, 158 A. 865, 865–66 (1931).

Several authorities from very persuasive sources directly hold that the presence of an assignment clause is immaterial to the right of a mortgagee to obtain a security interest in a mortgagor's rents. One is *Teal v. Walker, supra,* where the Supreme court expressly holds that, despite the presence of an assignment of rents clause, a mortgagee is not entitled to rents from a tenant whose lease succeeded the mortgage. 111 U.S. at 250–51, 4 S.Ct. at 424–25. The second is *Malamut v. Haines, supra,* where our district court, which reviews our decisions and to which we must thus pay particular deference, holds that, even where a clause conveying the mortgage exists, foreclosure is a prerequisite to a mortgagor's asserting rights to rents under a lease entered into subsequent to a mortgage. 51 F.Supp. at 842–43. Finally, in *DiToro,* the only prior decision of this court, the presence of a clause which expressly provided that an assignment of rents was included in the mortgage, 17 B.R. at 838, did not prevent the court from extensive reliance on *Henshaw,* 17 B.R. at 839; 22 B.R. at 394.

before the commencement of the case." H.R.REP. No. 595, 95th Cong., 1st Sess. 371 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6327; and S.REP. No. 989, 95th Cong., 2nd Sess. 86 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5872.

There is no indication in *Henshaw*, or elsewhere in Pennsylvania law, that a mortgagee's lien on rents ever relates back to a date prior to perfection when perfection is finally effected. Therefore, it seems clear to us that § 546(b) has no application to the instant situation.

Skokie suggests that the language of § 546(b) renders it possible for a lienholder to effect any lien requiring seizure post-petition by providing notice of same. However, we believe that the language of § 546(b) in fact applies only to the narrow class of liens which are *effected* pre-petition by operation of law, and relate back to the date of the filing when *perfected*.[2]

As indicated above, we recognize that some authority supports Skokie's position that § 546(b) allows a mortgagee to effect a security interest in rents by the dispatch of a post-petition notice, most notably *Consolidated Capital Income Trust v. Colter, Inc.*, 47 B.R. 1008, 1011–12 (D.Colo.1985); *In re Gelwicks*, 81 B.R. 445, 448 (Bankr.N. D.Ill.1987); *In re Morning Star Ranch Resorts*, 64 B.R. 818, 822–23 (Bankr.D.Colo. 1986); and *In re Selden*, 62 B.R. 954, 956–58 (Bankr.D.Neb.1986). However, none of these cases analyze the "relating back"

issue except *Selden*, in which the court, somewhat regretfully, feels compelled to adhere to prior precedent in the district court despite that this precedent ignored the "relating back" issue. The *Morning Star* decision, likewise, mostly follows the *Colter* district court decision without significant analysis.

We find the reasoning of the following cases to the contrary much more convincing: *In re Pritchard Plaza Associated Limited Partnership*, 84 B.R. 289, 298, 300–01 (Bankr.D.Mass.1988); *In re Hamlin's Landing Joint Venture*, 77 B.R. 916, 920–21 (Bankr.M.D.Fla.1987); and *In re Gotta*, 47 B.R. 198, 202 (Bankr.W.D.Wis. 1985). The decisions in each of these cases properly recognizes that § 546(b) only allows post-petition perfection of a mortgagee's lien on rent that "relates back" to the date that the lien was effected. Finding that, under the pertinent laws of the respective states in question that no "relation back" occurs in the lien of a mortgagee upon rents, those courts properly declined to apply § 546(b) to the facts before them.

Some of the differences in the results of these different lines of cases may be attributable to different state laws. *E.g., In re Casbeer*, 793 F.2d 1436, 1443–44 (5th Cir. 1986) (court apparently holds that § 546(b) is applicable because, under Texas law, a creditor's perfection of a security interest in rents may relate back to an earlier date in certain circumstances);[3] and *In re Winslow Center Associates*, 50 B.R. 679, 681 &

---

**2.** One very good example of such a lien is the water and sewer lien which we considered in *In re Aikens*, 87 B.R. 350 (Bankr.E.D.Pa.1988). In fact, in *Aikens*, we held that one property of a "statutory lien" is that it is valid without filing and "relates back" to an earlier date when filed. *Id.* at 356. Another example is a mechanic's lien or a materialmen's lien. *See, e.g., In re Yobe Electric, Inc.*, 30 B.R. 114, 116–19 (Bankr. W.D.Pa.1983), *aff'd*, 728 F.2d 207 (3d Cir.1984); and *In re Peek Construction Co.*, 80 B.R. 226, 228–29 (Bankr.N.D.Ala.1986).

Skokie could not seriously contend and does not contend that its purported lien is a statutory lien. It does, however, argue on reconsideration that (1) In light of the presence of the broad assignment clause in the mortgage, only notice to tenants is required to effect a security interest in rents irrespective of whether a particular lease preceded or succeeded the mortgage; and (2) The notice which it filed on April 1,

1988, was sufficient to establish notice to the tenants. We reject the first premise of this argument because we believe that it misreads the applicable state law. See page 355 n. 1 *supra.* Assuming *arguendo* that we accepted the first premise, we reject the second premise also, because we perceive nothing in § 546(b) which would suggest that any filing pursuant to it has any application in any event to non-debtor parties, such as the tenants, as opposed to a debtor.

**3.** In that decision, the Fifth Circuit Court of Appeals nevertheless declines to hold that the mortgagee had a security interest in rents under the facts before it. This analysis and result is similar to that of an earlier decision of the same court in addressing a similar issue in *In re Village Properties, Ltd.*, 723 F.2d 441, 447 (5th Cir.1984).

n. 2 (Bankr.E.D.Pa.1985) (mortgagee entitled to security interest in rents because New Jersey law gives mortgagee a vested interest in rents at the time of creation of the mortgage, in contrast to Pennsylvania law). However, as indicated above, our analysis of the pertinent Pennsylvania law causes us to conclude, without hesitation, that there is no "relating back" of a mortgagee's lien on rents. No case so holding has been identified.[4] Our analysis of § 546(b) thus causes us to conclude that it cannot effect, as opposed to perfect, mortgagee's lien on rents. We therefore reject Skokie's contention that it has a lien on any of the Debtor's rents, at least on the record before us.

■ However, even had we concluded that Skokie had a lien on some or all of the rents collected by the Debtor, we doubt whether we would have placed restrictions, in addition to those included in the agreement of April 28, 1988, upon the Debtor as a condition for allowing it to continue to use Skokie's or Concap's cash collateral.

As the Debtor notes, we have articulated the considerations which a court must undertake to determine whether a creditor's interests are "adequately protected" under 11 U.S.C. § 361 thusly in *In re Tashjian,* 72 B.R. 968, 973 (Bankr.E.D.Pa.1987):

> we believe that determination of whether a secured lender received "adequate protection" from a debtor requires an analysis of all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan.

We have repeatedly applied the considerations set forth in *Tashjian,* although a consumer case, to "adequate protection" issues in business cases. See *N.H. Ave.,* 85 B.R. at 309; *In re Gulph Woods Corp.,* 84 B.R. 961, 972 (Bankr.E.D.Pa.1988); and *In re Cann & Saul Steel Co.,* 76 B.R. 479, 485

(Bankr.E.D.Pa.1987). *See also In re Grant Broadcasting of Philadelphia, PA, Inc.,* 71 B.R. 376, 384–89 (Bankr.E.D.Pa.), *aff'd,* 75 B.R. 819 (E.D.Pa.1987).

The Debtor here fares very well when the facts on the record here are compared to those in *Grant Broadcasting, Cann & Saul,* or *N.H. Ave.* The value of the collateral, which is the stable commodity of realty as opposed to the speculative value of independent television stations or a financially troubled steel company, is considerable. The prospects for appreciation of the collateral are much brighter than in any of the foregoing cases, including *N.H. Ave.* The property here is much larger than that in issue in *N.H. Ave.* and is not, as was the property in issue there, subject to encumbrances which could impede its development. Here, there is unrebutted testimony that the value of the property is appreciating at a rate in excess of eight (8%) percent per annum.

As we pointed out in *Gulph Woods,* we are most reluctant to reject feasible hypotheses of debtors regarding prospects of reorganization which are presented at an early stage in the proceedings, if the debtor appears financially viable. 84 B.R. at 973. The prospects of the Debtor here for formulation of a successful plan are brighter than those in any of the foregoing cases, including *N.H. Ave. Compare id.,* 85 B.R. at 311. These prospects are clearly more promising than the contrived submission, fatally flawed by ineffective management at the debtor's helm, with which we were presented in *Gulph Woods. Compare id.,* 84 B.R. at 974–75.

When faced with debtors whose stability both creditors and the court seriously questioned, we have, *sua sponte,* attached conditions to the continued use of cash collateral. See *Cann & Saul,* 76 B.R. at 489–90; and *Grant Broadcasting,* 71 B.R. at 390. However, we have not done so where the creditors' attack appeared unfocused or weak. See *N.H. Ave.,* 85 B.R. at 311–12. In the instant case, the parties negotiated a

---

**4.** This is particularly so as to the argument that the prescribed notice to the tenants could relate back. See page 356 n. 2 *supra.*

detailed set of conditions on April 28, 1988, which has, despite the difference which arose regarding the escrow deposit, proved workable. Pursuant thereto, there is a monthly submission by the Debtor of complete budget data to all interested creditors. Monthly operating statements, including copies of bank statements, have been faithfully filed. The tax escrow is being maintained. Funds are accumulating. We can see no just basis for tinkering with the terms of this agreement now.

We would also be disinclined to adhere to the suggestion of Skokie and Concap that we direct the Debtor to make payments to particular creditors, including of course themselves, at this juncture. The Debtor gives all indicia of having a distinct awareness of its own financial needs. We are not prepared to second-guess its business judgment to put aside cash to effectuate a refinancing of its debts, at least on a record which lacks any hard evidence that the Debtor's judgment generally or in this particular instance is not worthy of deference.

We are, of course, concerned with the extension of any cash collateral order into perpetuity, particularly when no draft of a plan has yet appeared. Recently, the Debtor's exclusivity period to file a plan, pursuant to 11 U.S.C. § 1121(b), was extended to October 24, 1988. We think that just before this period expires would be an appropriate time to consider whether we should renew this Order once again. Therefore, we shall extend the effective date of the April 28, 1988, cash collateral agreement until October 24, 1988, and schedule a hearing to determine whether we should continue the agreement intact in the week before, on October 19, 1988.

We reaffirm our Order of August 18, 1988, so providing.

### ORDER

AND NOW, this 4th day of October, 1988, after argument of September 28, 1988, and review of Briefs of several interested parties in reference to the Motion of Skokie Federal Savings and Loan Association (hereinafter referred to as "Skokie") to

Reconsider Opinion and Order Dated August 18, 1988, it is hereby ORDERED as follows:

1. The Motion is GRANTED in part.

2. Our Opinion of August 18, 1988, is WITHDRAWN and replaced by the within Amended Opinion.

3. The Order of August 18, 1988, accompanying our Opinion of August 18, 1988, shall remain in full force and effect.