**In re FRANKLIN PEMBROKE VEN-
TURE II a/k/a Franklin/Labonte
Venture II, Debtor.**

**Bankruptcy No. 89–12991S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 5, 1989.

Barry D. Kleban, Adelman Lavine Gold
and Levin,. Philadelphia, Pa., for debtor.

David S. Hope, Schnader, Harrison, Se-
gal & Lewis, Philadelphia, Pa., for Credi-
tors' Committee of FRG, Inc.

Alexander Rubin, Rubin, Quinn & Moss,
Philadelphia, Pa., for Com. Sav. and Loan
Ass'n of Florida.

Jeffrey Schwartz, Hahn & Hessen, New
York City, Max Lieberman, Pelino & Lentz,
Philadelphia, Pa., for FRG, Inc.

James J. O'Connell, Ass't. U.S. Trustee,
Philadelphia, Pa.

OPINION

DAVID A. SCHOLL, Bankruptcy
Judge.

At issue in this bankruptcy case filed
less than two months ago on August 15,
1989, is the critical matter of whether the
Debtor can utilize its sole source of income,
*i.e.*, rents from the tenants of its only as-
set, an office complex located in southeast-
ern Florida, to pay its ordinary expenses
and costs and hence remain viable. As we
are reluctant to prevent a debtor from
making at least a reasonable attempt to
formulate a confirmable Plan and reorga-
nize, we are inclined to allow the Debtor to
continue to use cash collateral under basi-
cally the same restrictions imposed upon it
from the outset. We are particularly so
inclined because we have serious doubts as
to whether the Debtor's only secured credi-
tor, which opposes its use of cash collat-
eral, Commonwealth Savings and Loan As-
sociation of Florida (hereinafter "Common-
wealth"), has a valid security interest in
those rents under applicable Florida law.

The Debtor, FRANKLIN PEMBROKE
VENTURE II a/k/a FRANKLIN/LA-
BONTE VENTURE II, is related to a
group of Debtors whose cases were filed
on May 17, 1989, in the Southern District of
New York (hereinafter "SDNY") and trans-
ferred to this jurisdiction per a Decision of
July 28, 1989, by the Honorable Howard C.
Buschman III of the SDNY on a motion to
change venue to this court pursuant to 28
U.S.C. § 1412. Among the cases transfer-
red were filings by FRP Limited Partner-
ship (hereinafter "FRP"), the general part-
ner of Franklin Pembroke Pines Associ-
ates, the Debtor's managing venture part-
ner; and FRG, Inc. (hereinafter "FRG"),
the general partner of FRP.

On August 18, 1989, after an expedited
hearing, Commonwealth agreed to allow
the Debtor temporary use of cash collat-
eral, subject to certain dollar limitations
and an agreement of the Debtor that it
would submit certain reports of its finan-
cial activities to Commonwealth pending a
final cash collateral hearing on September
13, 1989. On September 13, 1989, Com-
monwealth appeared and vigorously con-

tested the Debtor's motion to use cash collateral under any conditions. At the close of the hearing, we indicated an intention, memorialized in two Orders of September 18, 1989, to keep the terms of the temporary Order of August 18, 1989, in effect pending a decision on the permanent order, concerning which we invited simultaneous briefing from the interested parties on or before September 27, 1989.

The Debtor is the owner of one asset, the Pembroke Pines Professional Center, an office complex. At the hearing, Commonwealth, through Senior Vice–President William H. Brimacombe, produced a Mortgage and Security Agreement and a Conditional Assignment of Rents and Leases dated February 20, 1985, both of which were executed in connection with construction for the complex. Under the terms of each of these documents, the Debtor authorized Commonwealth, in the event of default,

> at its option, to enter and take possession of the mortgage premises and to manage and operate same, to collect all or any rents accruing therefrom and from said leases and subleases, to let or re-let portions of said premises, terminate or modify any defaulted lease or sublease, evict tenants or occupants, bring or defend any suits in connection with the possession of said premises in its own name or [the Debtor's] name, make repairs as [it] deems appropriate, and perform such other acts in connection with the management and operation of said premises as [Commonwealth], in its judgment, may deem proper.

The balance of the underlying obligation, in the principal amount of $8.9 million at its inception, was alleged to be almost $9.6 million at present. After a period of unsuccessfully attempting to work with the Debtor after its default in all payments due since September 1, 1987, Brimacombe forwarded a letter of July 28, 1989, to the Debtor, demanding that defaults then just under $800,000 be cured within ten (10) days and that, if the sum were not paid as requested, demanding that all rents, profits, and income from the complex be paid to it.

Also testifying on behalf of Commonwealth was Robert B. Love, a real estate appraiser located proximately to the complex, who valued it at $9.7 million.

The Debtor's sole witness was Aurin Primock, the chief operating officer of FRG. He testified to the initial difficulties suffered by the Debtor due to the financial collapse of Jack Labonte, the principal of the Debtor's original managing partner. Primock testified that the Debtor was still in the process of fitting out the complex for initial tenants, had achieved sixty-nine (69%) percent occupancy, and, with an investment of capitol for additional fit-outs, believed that occupancy could be increased to seventy-nine (79%) percent by the end of 1989. However, Primock also noted that a very competitive local market required the Debtor to offer several months free rent to entice prospective tenants, which impeded cash flow from new tenants. He produced a set of Projections through December, 1991, which had been prepared in February, 1989, and Current Budgeted Cash Needs through December, 1989. Primock admitted that the Debtor was already performing poorer than its Projections. The Budget, including significant expenditures for fit-outs, portrayed an excess of expenses over income of more than $56,500 through the period ending the year, 1989, even without the Debtor's making any debt-service payments.

In sum, the picture presented was that the Debtor had little, if any, equity in its sole asset and that future short-range losses were imminent. On the other hand, Primock appeared realistic and well-centered as to the Debtor's future plans, and long-term appreciation of the asset seemed likely.

We have repeatedly expressed a reluctance to terminate a debtor's reasonable and well-controlled use of a major secured creditor's cash collateral (and, where same have been filed, have denied motions by such creditors under § 362(d)) even when the debtor's equity position was negative, *see In re TM Carlton House Partners, Ltd.,* 91 B.R. 349, 351–52, 357–58 (Bankr.E. D.Pa.1988); and *In re Cann & Saul Steel*

*Co.,* 76 B.R. 479, 483–89 (Bankr.E.D.Pa. 1987); when the Debtor was losing large sums of money, *see In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 376, 381, 384–90 (Bankr.E.D.Pa.), *aff'd,* 75 B.R. 819 (E.D.Pa.1987); and when the Debtor was saddled with previously deficient management. *See In re 1606 New Hampshire Ave. Associates,* 85 B.R. 298, 302, 307–12 (Bankr.E.D.Pa.1988) (hereinafter cited as *"N.H. Ave."*) In these cases, we have adopted a holistic approach, focusing upon whether the creditor opposing use of its cash collateral is able to establish that its interests are not adequately protected. Moreover, the issue of adequate protection, in these circumstances, is measured by

> "an analysis of all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan."

*Carlton House, supra,* 91 B.R. at 357 (quoting *In re Tashjian,* 72 B.R. 968, 973 (Bankr.E.D.Pa.1987)). *See also N.H. Ave., supra,* 85 B.R. at 309; *Cann & Saul, supra,* 76 B.R. at 485; and *Grant Broadcasting,* 71 B.R. at 388–89. We have ruled entirely in favor of the secured creditors on such motions only where it was apparent, due to developments in the course of a case, that a debtor was unlikely to successfully reorganize. *See In re Gulph Woods Corp.,* 84 B.R. 961, 971–73 (Bankr.E.D.Pa. 1988).

The cases to which the instant case is the most factually analogous are *Carlton House* and *N.H. Ave.* Like *Carlton House,* the only issue presented is the Debtor's ability to use cash collateral, not a § 362(d) motion. The absence of a § 362(d) motion suggests an awareness by the secured creditor that immediate foreclosure of the debtor's realty assets is impractical. Also, like the respective debtors in both *Carlton House* and *N.H. Ave.,* the Debtor here is a one-asset realty partnership whose equity position is doubtful but whose management appears to be reasonably competent. *Compare Gulph Woods,*

*supra,* 84 B.R. at 974–75 (debtor doomed by intractable incompetent management). It is doubtful that the stable asset of real estate is likely to depreciate (and it may well appreciate) while the Debtor makes an attempt to successfully reorganize. *See Carlton House,* 91 B.R. at 357–58; and *N.H. Ave.,* 85 B.R. at 308–12.

In some respects, the Debtor here has brighter prospects than the debtors in either of those analogous cases. The *Carlton House* debtor, almost so large as to be unmanageable, overcame significant disputes with certain of its major tenants, *e.g., In re TM Carlton House Partners, Ltd.,* 93 B.R. 859 (Bankr.E.D.Pa.1988); disputes with its limited partners; and conflicting pressures from an assembly of secured creditors with different aims and goals, and nevertheless it ultimately had a Plan of Reorganization confirmed. The *N.H. Ave.* building was small, old, and, being subject to encumbrances due to its status as a historic property, its development was impeded. The asset of the Debtor here is a new complex in an area of the country that is experiencing significant economic growth. Therefore, assuming *arguendo* that we concluded that Commonwealth has a valid security interest in the Debtor's rents, we would be inclined to allow the Debtor to use Commonwealth's cash collateral. This permission to use cash collateral would, in any event, be on a relatively short leash. The restrictions placed in the temporary order must remain intact, and we will, in addition, restrict the use to about a 90–day period, after which we will evaluate the Debtor's progress towards achieving a Plan of Reorganization and meeting its own Projections and Budget.

The issue of whether Commonwealth has a valid security interest in the Debtor's rents is therefore an interesting issue, but not one which is determinative of the outcome of this contested matter. The starting point for discussion of this issue is acknowledgement that the law of Florida, prior to 1988, was clearly established as requiring that, irrespective of the contents of the mortgage documents, a mortgagee became entitled to his mortgagor's rents

pledged as security only upon consent of the owner or as the result of a foreclosure proceeding. *See In re Hamlin's Landing Joint Venture,* 77 B.R. 916, 919–20 (Bankr. M.D.Fla.1987) (per PASKAY, CH. J.); *In re Executive Square, Ltd.,* 77 B.R. 303, 304 (Bankr.S.D.Fla.1987) (per BRITTON, CH. J.); *In re Parham,* 72 B.R. 604, 605–06 (Bankr.M.D.Fla.1987) (per PROCTOR, J.); and *White v. Anthony Inv. Co.,* 119 Fla. 108, 160 So. 881, 882 (1935). *Cf. Teal v. Walker,* 111 U.S. 242, 250–51, 4 S.Ct. 420, 424–25, 28 L.Ed. 415 (1884); and *Carlton House, supra,* 91 B.R. at 353–57. Thus, had this motion arisen prior to 1988, we would have concluded rather easily that Commonwealth had no security interest in the Debtor's rents.

However, in 1988, the Florida legislature changed this law by enacting Fla.Stat. § 697.07 (hereinafter referred to as "the New Law"), which provides as follows:

> A mortgage may provide for the assignment of rents. If such assignment is made, such assignment shall be absolute upon the mortgagor's default, becoming operative upon written demand made by the mortgagee. Upon application by the mortgagee, a Court of competent jurisdiction may require the mortgagor to deposit such rents in the registry of the court pending adjudication of the mortgagee's right to the rents, any payments therefrom to be made solely to protect the mortgaged property and meet the mortgagor's lawful obligations in connection with the property. Any undisbursed portion of said rents shall be disbursed in accordance with the Court's final judgment or decree.

In *In re Aloma Square, Inc.,* 85 B.R. 623, 635 (Bankr.M.D.Fla.1988), Judge Proctor had before him the issue of whether the above statute should be applied retroactively, *i.e.,* in interpreting mortgage documents executed *prior* to its enactment. It must be noted, however, that the relevant documents in that case contained what Judge Proctor described as "an unqualified or absolute assignment of rents." *Id.* at 624. Judge Proctor concluded, *id.* at 625, as follows:

Generally, in the absence of a clear legislative intent to the contrary, a law is presumed to act prospectively only. *See Walker & LaBerge, Inc. v. Halligan,* 344 So.2d 239 (Fla.1977). However, where the statute is remedial in nature or relates only to modes of procedure which do not create new or take away vested rights, the prohibition against retroactive application does not apply. *Lakeland v. Catinella,* 129 So.2d 133 (Fla.1961); *Johnson v. State,* 371 So.2d 556 (Fla. 2d DCA 1979); 49 Fla.Jur.2d *Statutes* §§ 106–109.

Therefore, he applied the New Law retroactively to the case at bar.

The harsh result in *Aloma Square*—Judge Proctor went on to conclude that a pre-petition written demand provided the mortgagee with a right to possession of the debtor's rents unencumbered by the automatic stay, *id.* at 625–26—was tempered somewhat by Chief Judge Paskay's decision in *In re One Fourth St. North,* 103 B.R. 320 (Bankr.M.D.Fla.1989). There, implicitly agreeing with the conclusion reached in *Aloma Square* that the New Law was procedural, Judge Paskay held that the mortgagee was not entitled to immediate, unconditional possession of all of the rents despite having made a demand for same, but that the determination of whether the mortgagee was entitled to the rents was subject to the discretionary directive of "a Court of competent jurisdiction." Ultimately, Judge Paskay allowed the debtor to retain twenty-five (25%) percent of the net income from the rents.

Meanwhile, a Minnesota bankruptcy court construing Florida law in *In re Camelot Associates Limited Partnership,* 102 B.R. 161, 165–66 (Bankr.D.Minn.1989), refused to accept the reasoning of *Aloma Square* as an accurate assessment of the retroactivity of the New Law. The *Camelot Associates* court concluded, instead, that a retroactive application of the statute would impair substantive rights "vested prior to the enactment" of the New Law, *id.* at 166, contrary to applicable Florida law relating to retroactivity of statutes.

The observations of the *Camelot Associates* court are certainly not without logical basis. "The principle that statutes operate only prospectively, while judicial decisions operate retroactively, is familiar to every law student." *United States v. Security Industrial Bank*, 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982). *Accord, e.g., Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964); *United States v. Richardson*, 512 F.2d 105, 106 (3d Cir.1975); *Young v. Altenhaus*, 472 So.2d 1152, 1154 (Fla.1985); and *Seaboard S. R.R. v. Clemente*, 467 So.2d 348, 357 (Fla.App.1985). There is, moreover, support for the principle, in decisions from other jurisdictions, that changes in the law similar to those affected by the new Florida statute here are substantive, and should not be applied retroactively as to mortgages that were executed prior to the statute's enactment. *See In re Federal Shopping Way, Inc.*, 457 F.2d 176, 180 (9th Cir.1972); and *Investors Syndicate v. Smith*, 105 F.2d 611, 621 (9th Cir.1939).

At the time of execution of the Mortgage and Conditional Assignment in issue in 1985, the Debtor certainly had reason to assume that Commonwealth could obtain possession of its rents from its tenants only with its consent or upon court order. Only after the enactment of the New Law would a mere demand such as the letter of July 28, 1989, have served as a device sufficient in itself to allow Commonwealth to trigger a perfected security interest in its rents. Of course, had the Debtor been vigilant, it would have taken advantage of the 10–day period between the dispatch of the letter and its effectiveness as a demand device under its own terms, and filed bankruptcy before rather than after the 10–day period passed.

The Debtor also argues, with some persuasiveness, that the terms of the Mortgage and the Conditional Assignment themselves, see page 3 *supra,* require Commonwealth to enter and take possession of the premises before it is entitled to collect the rents accruing from its leases. The New Law provides that a mortgagee has a right to possession of the rents on demand if and only if "such assignment is made" in the operative documents. In *Aloma Square,* the assignment of rents was, unlike the terms of the operative documents here, "unqualified and absolute."

Commonwealth attempts to avoid this argument by contending that the phrase "at its option" gives it the option of entering the premises or obtaining a security interest in the rents by making a demand such as would be effective under the New Law. However, it is apparent to us that the phrase "at its option" merely gives Commonwealth the option to enter and take possession of the property and thereby acquire a security interest in the rents, or to simply not obtain a security interest in the rents.

We therefore question whether Commonwealth has a valid security interest in the Debtor's rents, which is its burden to establish if it is to prevail in this matter. *See* 11 U.S.C. § 363(*o* ). However, irrespective of whether it does have such a security interest in the Debtor's rents or not, we feel sufficiently uncomfortable about the Debtor's prospects that we would be disinclined, in any event, to allow the Debtor to have unfettered use of the rents. As in *Carlton House, supra,* 91 B.R. at 357–58, we will keep restrictions on the Debtor's use of the rents in place irrespective of our belief that the rents may not constitute the mortgagee's cash collateral. We will therefore include most of the conditions which appeared in our August 18, 1989, and our September 18, 1989, Orders, in the instant Order as well. We will also require the Debtor to produce a proposed Plan and Disclosure Statement on or before December 7, 1989, just prior to the expiration of its exclusivity period. *See* 11 U.S.C. § 1121(d); *Cann & Saul, supra,* 76 B.R. at 490; and *Grant Broadcasting,* 71 B.R. at 390. Finally, we will continue this Order in effect until January 5, 1990, two days after a scheduled hearing to consider any objections to the Debtor's Disclosure Statement and whether this Order shall be extended.

An Order as described above will be entered.

## ORDER

AND NOW, this 5th day of October, 1989, upon consideration of the Motion of Debtor for Permanent Use of Rents or, in the Alternative, Cash Collateral following a hearing of September 13, 1989, and receipt of the respective parties' Briefs addressing this issue, it is hereby ORDERED AND DECREED as follows:

1. The Debtor may utilize the rents obtained from its tenants, irrespective of whether or not Commonwealth Savings and Loan Association of Florida (hereinafter "Commonwealth") has a valid, perfected and enforceable security interest in same, under the following conditions:

    a. The Debtor may use the rent income to pay expenses and costs incurred in the ordinary course of business in an amount not to exceed the amounts recited in its "Projected Cash Needs," admitted into evidence at the hearing of September 13, 1989, as Exhibit D–6, a copy of which is attached hereto as Appendix "A," by a total amount or as to any line-item of Expenses therein by more than ten (10%) percent.

    b. Commonwealth is granted a replacement lien upon, and security interest in, the Debtor's post-petition rents to the extent that it is ultimately determined that these rents are its cash collateral and that the Debtor uses same.

    c. The Debtor shall provide Commonwealth with the Debtor's monthly statement of operations for September, 1989, and each month thereafter.

    d. The Debtor shall provide Commonwealth with bank statements reflecting the location, balance, all deposits and all withdrawals from any Debtor-in-Possession account(s) established by the Debtor since August 15, 1989.

    e. The Debtor shall allow Commonwealth access to Debtor's books and records on two (2) days' prior written notice to the Debtor and the Debtor's counsel, and the Debtor's personnel shall cooperate with Commonwealth in Commonwealth's review of such books and records provided that Debtor's normal business operations shall not be unreasonably interfered with.

    f. The Debtor shall give prior notice to Commonwealth and its counsel of any expenditure which is not a specific item on Appendix "A" attached hereto but which it believes is necessary to be paid in the ordinary course of Debtor's business.

    g. The Debtor shall remit to Commonwealth the amount necessary to fund the applicable taxes and insurance obligations for the interim period. Commonwealth shall continue to deposit such amounts into a segregated escrow account to be established in the name of "Commonwealth Savings and Loan Association of Florida, escrow agent for Franklin Pembroke Venture II, a/k/a Franklin/Labonte Venture II, DIP" in accordance with the applicable provisions of the Bankruptcy Code.

2. This Order shall remain effective, unless superseded, only through January 5, 1990.

3. The Debtor shall prepare, file, and appropriately notice all interested parties of the filing of a Proposed Plan of Reorganization and Disclosure Statement on or before December 7, 1989.

4. A hearing will be held to determine whether the terms of this Order should be extended and whether the proposed Disclosure Statement is adequate on

WEDNESDAY, JANUARY 3, 1990, AT 10:00 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

APPENDIX

Pembroke Pines Professional Center
Budgeted Cash Needs
September 16 thru December 31, 1989

cash on hand 8/15/89: $20,152

| | Sept 16– Sept 30 | Oct 1– Oct 31 | Nov 1– Nov 30 | Dec 1– Dec 31 |
|---|---|---|---|---|
| Begin cash | 66,028 | 58,019 | 57,493 | 4,389 |
| Income: | | | | |
| rental | 14,787 | 67,987 | 67,987 | 67,987 |
| cam | 5,695 | 16,903 | 16,903 | 19,073 |
| sales tax | 1,229 | 5,093 | 5,093 | 5,224 |
| | 21,711 | 89,983 | 89,983 | 92,284 |
| Expenses: | | | | |
| real estate tax escrow | | 10,417 | 10,417 | 10,417 |
| insurance escrow | | 1,299 | 1,299 | 1,299 |
| sales tax | | 5,214 | 5,031 | 5,031 |
| janitorial services | 4,450 | 4,450 | 4,450 | 4,450 |
| management fee | | 4,040 | 4,499 | 4,499 |
| electric | 9,000 | 4,985 | 4,985 | 4,985 |
| landscaping | | 3,200 | 3,200 | 3,200 |
| payroll & related | 1,458 | 2,690 | 3,923 | 2,690 |
| contractual services | | 2,500 | 2,500 | 2,500 |
| supplies | 500 | 985 | 985 | 985 |
| telephone | 2,350 | 1,100 | 1,100 | 1,100 |
| trash removal | | 668 | 668 | 668 |
| repairs & maintenance | | 500 | 500 | 500 |
| plant rental | | 634 | 634 | 634 |
| water & sewer | | 443 | | 443 |
| security | 157 | 222 | 222 | 222 |
| parking lot maintenance | 150 | 150 | 150 | 150 |
| muzak | | 75 | 75 | 75 |
| general & admin | 92 | 92 | 92 | 92 |
| exterminating | 70 | 70 | 70 | 70 |
| operating expenses | 18,227 | 43,734 | 44,799 | 44,010 |
| net operating income | 3,484 | 46,249 | 45,183 | 48,273 |
| commissions | 7,660 | 7,178 | 12,115 | 7,178 |
| tenant fit-out | 3,833 | 39,597 | 86,173 | 44,000 |
| total expenses | 29,720 | 90,508 | 143,087 | 95,188 |
| cash flow | (8,009) | (526) | (53,104) | (2,905) |
| cum cash flow | 58,019 | 57,493 | 4,389 | 1,484 |
| Projection of Tenant Improvements: | | | | |
| commissions: | | | | |
| Bell & Howell | | 7,178 | | 7,178 |
| Federated Mortgage | 7,660 | | 7,660 | |
| Transamerica | | | 4,455 | |
| | 7,660 | 7,178 | 12,115 | 7,178 |
| tenant fitout: | | | | |
| F & S Mortgage | 244 | 16,445 | 14,990 | |
| Bell & Howell | 481 | 1,819 | 20,850 | |
| Federated Mortgage | 3,108 | 21,333 | 21,333 | |
| Transamerica | | | 29,000 | 44,000 |
| | 3,833 | 39,597 | 86,173 | 44,000 |
| Reconciliation of income to rent roll: | | | | |
| BASE RENT: | | | | |
| per rent roll | | 70,534 | 70,534 | 70,534 |

|  | Sept 16–Sept 30 | Oct 1–Oct 31 | Nov 1–Nov 30 | Dec 1–Dec 31 |
|---|---|---|---|---|
| less: HRS Management |  | (4,020) | (4,020) | (4,020) |
| add: American Mtge Exchange |  | 525 | 525 | 525 |
| Regency Reporting Services |  | 438 | 438 | 438 |
| Star National |  | 510 | 510 | 510 |
|  |  | 67,987 | 67,987 | 67,987 |
| **COMMON AREA** |  |  |  |  |
| per rent roll |  | 18,310 | 18,310 | 18,310 |
| less: HRS Management |  | (1,407) | (1,407) | (1,407) |
| add: Bell & Howell |  |  |  | 719 |
| Federated Mtge |  |  |  | 919 |
| F & S Mtge |  |  |  | 533 |
|  |  | 16,903 | 16,903 | 19,073 |