**In re Frederic A. SHAPIRO and Rosalie B. Shapiro, Debtors.**

**Bankruptcy No. 89–13772S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 4, 1990.

---

H. Marvin Mercer, III, Pincus, Dubroff, Ganz, Lightman & Weiss, P.C., Philadelphia, Pa., for debtors.

Maureen R. Brown, Patterson & Weir, Philadelphia, Pa., for Liberty Bank.

Robert J. Hoelscher, Drinker, Biddle & Reath, Philadelphia, Pa., for Atlantic Financial Federal and Philadelphia Nat. Bank.

Joseph S. Ziccardi, Philadelphia, Pa., for Royal Bank.

Richard Miller, Spector, Cohen, Gadon & Rosen, and Timothy Gallogly, Philadelphia, Pa., for Jefferson Bank.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

Lawrence J. Tabas, Philadelphia, Pa., for Cushman & Wakefield.

William F. Sadutti, Philadelphia, Pa., for Constitution Bank.

Rosetta B. Packer, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, Pa., for Fidelity Bank, Nat. Ass'n.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The instant motion by LIBERTY SAVINGS BANK (hereinafter referred to as "Liberty") for relief from the automatic stay to foreclose upon its security interest in a beachfront duplex owned by the Husband–Debtor, FREDERIC A. SHAPIRO (hereinafter "the Debtor"), located at 3104–06 Wesley Avenue, Ocean City, New Jersey (hereinafter "the Premises"), causes us to consider the validity, under applicable New Jersey law, of a "dragnet" or "spreader" clause in a mortgage which purports to render the Premises as security for prior indebtednesses as well as the transaction to purchase the Premises in connection with which the mortgage was executed. We conclude that, due to the lack of evidence regarding the intention of the Debtor to extend the mortgage to prior indebtednesses in executing what is obviously an adhesion contract; the absence of specific reference to the prior indebtednesses in the mortgage; the lack of relationship between the prior indebtednesses and the transaction in which the Premises was purchased; and the apparent attempt of the parties to

separately secure at least the largest of the prior indebtedness render the instant dragnet clause unenforceable as to the Premises. The value of the Premises appears considerably in excess of the balance of the mortgage executed when the Premises was purchased alone. Therefore, we find that Liberty has failed to meet its burden of showing that it holds a security interest which is not propped up by a considerable "equity cushion," and, with the caveat that the Debtor promptly prepare a Plan of Reorganization, we hold that the motion must be denied.

The Debtor and his wife filed the underlying joint voluntary Chapter 11 bankruptcy case on October 12, 1989. On November 8, 1989, Liberty filed the instant motion. Answers to the motion were filed by not only the Debtor, but also by Constitution Bank, and, jointly, by Atlantic Financial Federal and Philadelphia National Bank opposing the motion. A hearing was scheduled on December 6, 1989.

At that time, counsel dictated a stipulation of the following facts into the record. On November 21, 1986, the Debtor borrowed $150,000 from Liberty in an unsecured transaction, $66,616.25 of which was due and owing on the date of filing and, with addition of alleged post-petition interest, and the balance of which was $67,-628.69 as of November 30, 1989. On December 22, 1988, the Debtor made a second loan from Liberty in the amount of $600,-000, which was to be secured by a mortgage on a premises located at 1708 Locust Street, Philadelphia, Pennsylvania. However, by alleged fraud of the Debtor, the mortgage was never recorded and that debt was also unsecured.[1] The balance of this obligation was $606,252.14 at the date of filing, and had allegedly risen to $615,-409.26 as of November 30, 1989.

The third transaction is evidenced by a Note and Mortgage of February 22, 1989, in the face amount of $680,000, the proceeds of which were used to purchase the Premises. The entire text of the crucial paragraph two of the Mortgage reads as follows:

2. OBLIGATIONS SECURED. This Mortgage shall secure the repayment Mortgagee of:

(a) the indebtedness of Borrower to Mortgagee in the principal amount of $680,000., plus all interest, costs, and expenses (including without limitation attorney's fees) thereon, as evidenced by Borrower's promissory note or loan agreement given or assigned to Mortgagee, dated as of February 22, 1989, and any and all renewals, extensions, amendments, modifications, substitutions, continuations, consolidations, restatements, and the like thereof (all of the foregoing of which hereinafter shall be called the "Note"), (b) all future advances and loans made by Mortgagee to or for Borrower, including without limitation any and all term and other loans and any and all advances made under one or more lines of credit, letters of credit, or otherwise, (c) all other present and future indebtedness of Borrower to Mortgagee and of Mortgagor or Mortgagee, however and whenever incurred or evidenced of any nature whatsoever, (d) all amounts disbursed by Mortgagee for the payment of taxes, levies, or insurance on the Premises or for maintenance, repair, protection, or preservation of the Premises, or for any other purpose permitted herein, all of which amounts shall accrue interest at the rate set forth in the Note, and (e) any other indebtedness of Borrower to Mortgagee as evidenced by any promissory note or loan agreement or other agreement more particularly described in Section 22 hereof which, together with any and all renewals, extensions, amendments, modifications, substitutions, continuations, consolidations, restatements, and the like thereof, shall be

---

1. This transaction led to litigation by Liberty against Ticor Title Insurance Company (hereinafter "Ticor") at C.A. No. 89–7427 (E.D.Pa.), in which Liberty contends that Ticor, as insurer of title in the transaction, is liable to it for its failure to secure this transaction with the Locust Street property. Ticor has moved in this court to obtain relief from the automatic stay to join the Debtor as a third-party defendant in that action, which is listed for a hearing before us on January 10, 1990.

included in the term "Note" as used herein.

THIS MORTGAGE SECURES FUTURE ADVANCES; IN ADDITION [MARK AS APPLICABLE]:

☐ THIS ADVANCE MONEY MORTGAGE SECURES OBLIGATORY FUTURE ADVANCES. Mortgagee is obligated, under the provisions of a Note described herein, to make advances from time to time to or on behalf of Borrower up to an amount at any one time outstanding not in excess of $ N/A. It is expressly understood and agreed that this Mortgage secures, among other sums, all such obligatory future advances made from time to time by Mortgagee to Borrower and all such obligatory future advances shall be secured as if made on the date this Mortgage is recorded.

☑ THIS IS A PURCHASE MONEY MORTGAGE. All or part of the sums secured hereby constitute all or part of the purchase money of the Premises.

The balance of this obligation was $702,672.59 at the date of filing and, with the addition of interest, allegedly rose to $713,300.79 as of November 30, 1989.

All of the remaining documentary and testamentary evidence relates to the value of the Premises. The Premises was purchased by the Debtor under an Agreement of Sale dated January 18, 1989, for $840,000. Shortly thereafter and before it agreed to finance this purchase, Liberty had the Premises appraised by (1) Louis A. Iatorola, an eminent Philadelphia-based appraiser, see *In re 222 Liberty Associates,* 105 B.R. 798, 800 (Bankr.E.D.Pa.1989), at $950,000 on January 20, 1989; and (2) Henry Harkskowitz, a New Jersey-based appraiser, who valued it at $925,000 on January 21, 1989. One Richard L. Hirsch executed an Agreement of Sale, also admitted into the record by agreement, to purchase the Premises, dated August 12, 1989, for $920,000, but this transaction fell through due to the inability of Hirsch to obtain financing.

The only witness at the hearing was George W. Powell, another appraiser hired by Liberty. He presented an appraisal of November 30, 1989, valuing the gross sellout value of the Premises at $833,000, and the value to a purchaser, assuming the conversion of the Premises to its alleged highest and best use as twin condominium units, at $711,100. Powell, a resident and appraiser in Ocean City for over fifty (50) years, contended that the other appraisers had mistakenly used, as comparable sales, transactions of realty in the "Gold Coast" area of Ocean City, which is a lavishly improved area extending to within two blocks of the Premises, but not including the Premises. He also identified a "downward spiral" of values of beachfront properties, due to contamination of the area's beaches, which he measured at a total reduction of property values of ten to fifteen (10% to 15%) percent since the highwater value period of spring, 1988.

At the close of the hearing, any interested parties were allowed until December 18, 1989, to submit briefs supporting their respective positions. We noted that there was a reasonable likelihood that the parties opposing the relief would prevail and that therefore the stay would remain in effect pending our disposition, which is herein rendered within thirty (30) days from December 6, 1989. See 11 U.S.C. § 362(e); Bankruptcy Rule 4001(a)(2); *In re Wedgewood Realty Group, Ltd.,* 878 F.2d 693, 697–98 (3d Cir.1989); and *In re City Wide Press, Inc.,* 102 B.R. 431, 435 (Bankr.E.D. Pa.1989).

The parties, which include banks on both sides, devote almost all of their attention to the issue of the validity of Liberty's security interest in the Debtor's prior indebtednesses to Liberty as a result of the dragnet clause of the mortgage. This issue arises from subsection (c) to paragraph two of the mortgage, quoted at page 129 and 130 *supra,* which has, tucked away in it, a statement that, the Premises secures "all other present … indebtedness" as well as future indebtednesses and the $680,000 indebtedness arising from the loan to purchase the Premises. This issue is particularly elusive because none of the parties, nor we independently, have been able to locate a single

case decided under New Jersey law which addresses the enforceability of a dragnet clause.

However transfixing this issue might be, sight cannot be lost of the fact that this issue is not necessarily determinative of the instant § 362(d) motion, filed shortly after the commencement of a Chapter 11 case. In *In re Franklin Pembroke Venture II,* 105 B.R. 276, 277–78 (Bankr.E.D. Pa.1989), we put to one side the difficult and hotly-disputed issue of the validity of a security interest in rents under Florida law and rested our decision on our reluctance to resolve a cash collateral or a § 362(d) motion against a Chapter 11 debtor early in the case. We resolved the issue principally by determining whether the secured party was adequately protected, which we found was

> measured by "an analysis of all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan."

*Id.* at 278 (quoting *In re TM Carlton Partners, Ltd.,* 91 B.R. 349, 457 (Bankr E.D.Pa. 1988), quoting in turn *In re Tashjian,* 72 B.R. 968, 973 (Bankr.E.D.Pa.1987), and also citing to *In re New Hampshire Avenue Associates,* 85 B.R. 298, 309 (Bankr.E.D.Pa. 1988); *In re Cann & Saul Steel Co.,* 76 B.R. 479, 485 (Bankr.E.D.Pa.1987); and *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 376, 388–89 (Bankr.E.D.Pa.), *aff'd,* 75 B.R. 819 (E.D.Pa.1987).

Unfortunately, neither the Debtor nor the parties supporting him on this motion provided any record regarding the prospects of a plan and a successful reorganization in this case, as did the debtor in *Franklin Pembroke,* 105 B.R. at 278, or in the other cases cited *supra.* We are therefore inclined to deny this motion without prejudice, in the event that a record establishing such issues, or showing that they cannot be established, is made later. We also will require the Debtor to propose a plan shortly after the expiration of his exclusivity period, see 11 U.S.C. § 1121(d), or face possible dismissal or conversion of his case. *Compare id.* at 280–81.

Because of the void of evidence on the Debtor's prospects for reorganization, we are compelled to give more consideration of the difficult underlying substantive law issue here than we were in *Franklin Pembroke.* We therefore are obliged to address Liberty's claim that its particular dragnet clause rendered the Premises security for all three of its loans to the Debtor. Obviously, if Liberty were correct as to this issue, its obligation would be quite substantially undersecured, as the balance owed on the three debts totals well over $1.3 million, which clearly exceeds the value of the Premises. *See* page 135 *infra.*

Our analysis of the nature of Liberty's security interest, thus being necessary to the outcome, commences with some consideration of the burdens of proof of the respective parties involved in litigation of § 362(d) motions. This issue is important because the record here, except for evidence addressing the value of the Premises, which is of little pertinence to the issue of the validity of the dragnet clause, is rather sparse.

The Code, at 11 U.S.C. § 362(g), assigns the burden of proof to the movant "on the issue of the debtor's equity in property" and to the party opposing relief "on all other issues." While these Code provisions seem to cast most of the burdens upon the instant Debtor and his advocates, it cannot be forgotten that the initial burden of producing evidence to support a cause of action pursuant to § 362(d) falls upon the movant. *See, e.g., In re Ward,* 837 F.2d 124, 128 (3d Cir.1988); *In re Morysville Body Works, Inc.,* 86 B.R. 51, 55 & n. 7 (Bankr.E.D.Pa.1988) (per TWARDOWSKI, CH. J.); *In re Metro Transportation Co.,* 82 B.R. 351, 353 (Bankr.E.D.Pa.1988); *In re Borbridge,* 81 B.R. 332, 335 (Bankr.E.D. Pa.1988) (per FOX, J.); and *In re Stranahan Gear Co.,* 67 B.R. 834, 836–38 (Bankr. E.D.Pa.1986).

■ It is also clear that one aspect of the movant's proof of the debtor's equity (or lack thereof) in property against which the movant seeks permission to proceed under § 362(d) is establishing the validity of its alleged security interest in the said property. *See In re Grant Broadcasting of Philadelphia, Inc.,* 75 B.R. 819, 822–23 (E.D. Pa.1987), *aff'g Grant Broadcasting, supra,* 71 B.R. at 384–86. *Cf.* 11 U.S.C. § 363(*o*). Therefore, the burden of proving the expanse of its security interest in all of the Debtor's obligations, by virtue of the dragnet clause, falls squarely upon Liberty.

■ We initially note that the dragnet clause is inconspicuously included in the midst of a paragraph of a document which was obviously drafted, prepared, and presented to the Debtor by Liberty without negotiation over the specific terms of the contract on a take-it-or-leave-it basis. See pages 129–30 *supra.* We have frequently observed that inconspicuous boilerplate aspects of mortgage documents are classic adhesion contracts, which must be construed strictly against mortgagees. *See In re Burwell,* 107 B.R. 62, 65 (Bankr.E.D.Pa. 1989); and *In re Garnett,* 99 B.R. 293, 296 (Bankr.E.D.Pa.1989); *In re Andrews,* 78 B.R. 78, 81 (Bankr.E.D.Pa.1987); and *In re Jablonski,* 70 B.R. 381, 389 (Bankr.E.D. Pa.1987), *aff'd,* 88 B.R. 652 (E.D.Pa.1988).

A dragnet clause may purport to embrace either past indebtednesses of the obligor to the obligee, or future indebtednesses of the obligor to the obligee, or both. It is noteworthy that the particular paragraph 2 of the Mortgage in issue is far more conspicuous in advising that a security interest is taken as to future advances than it is in referencing a security interest as to past advances. See ¶ 2(b) and the large-printed warning that the mortgage covers future advances.[2]

We are mindful of these considerations in our interpretation of the general enforceability of dragnet clauses. The issue of enforceability varies from jurisdiction to jurisdiction and according to the particular facts of a given fact situation. *See generally,* Annot., *Debts Included in Provision of Mortgage Purporting to Cover All Future and Existing Debts (Dragnet Clause) —Modern Status,* 3 A.L.R. 4th 690 (1981).

The parties have located no New Jersey cases on point. The only cases cited by the parties are *Gale v. Morris,* 29 N.J.Eq. 222, 226 (N.J.Chan.), *aff'd,* 30 N.J.Eq. 285 (N.J. 1878), cited by the Debtor for the principle that a mortgage the extent of which could not be discovered in checking the registry is of fragile validity; and *Hall v. Lambert,* 7 N.J.Eq. 651, 652 (N.J.1850), cited by Liberty for the principle that, as between the parties, the amount of the mortgage need not be noted in the mortgage registry for the mortgage to be valid.

Both of these principles are of limited pertinence to the issue at hand. In *Gale,* the mortgage was held *valid* as to the complainants, who were found to have actual knowledge of the mortgage terms. 29 N.J.Eq. at 227. Here, it may not be conclusive that the mortgage is valid between the parties; it may be significant that it could be attacked by bona-fide purchasers, or by the debtors-in-possession standing in the shoes of a bona-fide purchasers. *Compare In re Aikens,* 94 B.R. 869, 873 (Bankr.E.D. Pa.), *aff'd sub nom. Aikens v. City of Philadelphia,* 100 B.R. 729 (E.D.Pa.), *aff'd sub nom. McLean v. City of Philadelphia,* 891 F.2d 474 (3d Cir.1989) (debtor may successfully attack city water and sewer liens when standing in shoes of trustee), *with In re Aikens,* 83 B.R. 344, 347 (Bankr.E.D.Pa. 1988) (debtors may not attack the same liens standing in their own shoes). *See also In re Morrison,* 69 B.R. 586, 590 (Bankr.E.D.Pa.1987).

**2.** Liberty steps outside of record to advise us that the Debtor "is a lawyer and a businessman and hence presumably understood all aspects of the Mortgage documents." We do not agree that the Debtor's professional status, even if satisfactorily proven, vitiates the "adhesion clause" aspect of the dragnet clause. Neither lawyers nor businessmen are apt to read and comprehend every clause in complex documents which they sign. Furthermore, the significance of an adhesion clause is that the obligee insists that it be included in a contract, irrespective of the obligor's knowledge of its presence.

There is a New Jersey statute deemed pertinent in the present inquiry by the Debtor and his adherents, N.J.S.A. § 46:9–8.2 (West 1989), which reads as follows:

Notwithstanding any other law to the contrary, the priority of the lien of the mortgage loan which by its terms is subject to modification, as defined by this act shall relate back to and remain as it was at the time of recording of the original mortgage as if the modification was included in the original mortgage or of the original mortgage. *The priority granted by this section shall not apply to any balance due in excess of the maximum specified principal amount which is secured by the mortgage, plus accrued interest, payment for taxes and insurance, and other payments made by the mortgagee pursuant to the terms of the mortgage* (emphasis added).

According to these parties, the emphasized portion of this statute prevents the Mortgage of February 22, 1989, from extending to any balance in excess of the $680,000 "maximum specified principal amount" thereon. Liberty counters by arguing that this statute only relates directly to the priority of mortgage loans modified by changes in interest rates and lines of credit, *see* N.J.S.A. 46:9–8.1d, and does not address the validity of dragnet clauses.

We have uncovered a New Jersey case, *Fidelity Union Title & Mortgage Guaranty Co. v. Magnifico*, 106 N.J.Eq. 559, 151 A. 499 (N.J.Ch.1930), which we believe is somewhat more pertinent to the inquiry at hand than the New Jersey cases cited by the parties which are discussed at page 132 *supra*. In that case, the court held that a judgment lien entered after a purchase-money mortgage was recorded, but prior to a subsequent advance pursuant to and allegedly secured by a future advances clause in the purchase-money mortgage, was given priority as against that portion of the mortgaged obligations given for future advances. *Id.* 106 N.J.Eq. at 563–64, 151 A. at 501. This result is similar to that of *Western Pennsylvania National Bank v. Peoples Union Bank & Trust Co.*, 439 Pa. 304, 306–07, 266 A.2d 773, 775 (1970),

that a mortgagee whose mortgage did not include a future advances clause did not have a prior security interest, as to the future advances, as against a subsequent bona-fide lien creditor. *Compare Morrison, supra,* 69 B.R. at 587, 591–92 (a former judgment creditor whose lien has been avoided cannot attack the priority of a mortgagee's security interest as to future advances, even pursuant to a mortgage which did not contain a future advances clause. However, the debtor-mortgagors there had specifically acknowledged, at the time of receipt of the later advances, that these advances were secured by the prior mortgage).

We believe that the *Magnifico* cases expresses a tendency of the New Jersey courts to refuse to give effect to the future advances aspect of a dragnet clause. The statute quoted, N.J.S.A. 46:9–8.2, is another indication of the same tendency. We do not think that the issue of priority is entirely separate from the issue of validity in a bankruptcy context, as Liberty suggests. As we indicated previously, at page 133 *supra*, a debtor-in-possession can attack an improperly registered security interest while standing in the shoes of the trustee who in turn may stand in the shoes of a bona-fide purchaser. The *Hall* holding regarding the insignificance of the recitation of the amount on the Mortgage document is countermanded by N.J.S.A. 46:9–8.2, enacted in 1985, 135 years after the *Hall* decision. Thus, the fact that Liberty's security priority in excess of $680,000 could be subject to attack by a bona-fide purchaser may be fatal to a claim of a security interest arising from the Mortgage in excess of that amount.

The significance of N.J.S.A. 46:9–8.2 is also supported by the interpretations, in *In re Bass*, 44 B.R. 113 (Bankr.D.N.M.1984); and *In re Davis*, 44 B.R. 88 (Bankr.D.N.M. 1984), of a similar New Mexico statute, N.M.S.A. 48–7–9 (1978), which provides as follows:

Every mortgage or other instrument securing a loan upon real estate and constituting a lien, or the full equivalent thereof, upon the real estate securing such

loan, may secure future advances, and the lien of such mortgage shall attach upon its execution and have priority from the time of recording as to all advances, whether obligatory or discretionary, made thereunder until such mortgage is released of record; *provided, that the lien of such mortgage shall not exceed at any one time the maximum amount stated in the mortgage* (emphasis added).

While the court recognized, in *Davis,* 44 B.R. at 90–91, that this statute expressly upholds the validity of future advances clauses generally, the same court further held, in *Bass,* 44 B.R. at 115–16, that, unless the intent of the parties to do so was stated in the mortgage with particularity, the mortgage would not be construed to cover past advances, nor, in light of the last emphasized clause of the New Mexico statute, would it cover future advances in excess of the stated amount of the mortgage. The *Bass* court was not troubled by the fact that the New Mexico statute addresses, primarily, the "mere" priority of the secured party's potential lien on future advances.

Having now identified what we believe is a general tendency of New Jersey lawmakers and courts to restrict the validity of dragnet clauses, we place this in the context of the observations of the exhaustive Annotation analyzing the general law of American jurisdictions on this subject cited at page 132 *supra.* That Annotation indicates that "certain tests" have been employed by courts to determine the intention of the parties and hence the validity of dragnet clauses in a variety of contexts. Annot., *supra,* 3 A.L.R. 4th at 695. These tests include: (1) Whether the other indebtednesses allegedly covered by the mortgage are expressly intentional therein. *Id.* at 695–96; (2) Whether the other indebtednesses allegedly covered are "of the same class" as the debt referenced in the mortgage. *Id.* at 696; (3) Whether the other indebtednesses were intended to be separately secured. *Id.* at 697–98; and (4) Whether the mortgagee relied on the clause in making further loans. *Id.* at 716.

We find the use of the dragnet clause here to come up short on all of these tests. First, there is no specific reference to the indebtednesses of November 21, 1986, or December 22, 1988, in the Mortgage of February 22, 1989. Obviously, since the other indebtednesses preceded the Mortgage, such references could have been made. Their absence leaves the very general and inconspicuous dragnet clause itself as the only indication of the existence of Liberty's alleged security interest in these indebtednesses.

Secondly, the indebtednesses of November 21, 1986, and December 22, 1988, were in no way related to the purchase of the Premises in 1989, which was the sole purpose of the loan for which the Mortgage was made.

Thirdly, the indebtedness of December 22, 1988, was intended by Liberty to be separately secured by the Debtor's 1708 Locust Street premises. It was only conduct on the part of the Debtor which Liberty now alleges was fraudulent that prevented the Locust Street premises from securing the December loan. It is very doubtful whether the Debtor's untoward actions relating to the December loan had come to light as of the date of the Mortgage; otherwise, it is doubtful that Liberty would have entered into a further transaction with the Debtor. There is not the slightest indication that the dragnet clause was included to "correct" the deficiency in the December, 1988, transaction.

Finally, the fourth issue of reliance by Liberty upon the dragnet clause in making a further loan to the Debtor was not a factor. Such reliance could never arise in a situation where the obligation sought to be swept within the dragnet is a past indebtedness as opposed to a future indebtedness. This observation suggests that dragnet clauses will more readily be enforced as to future advances than as to past advances. We note again that the dragnet clause in the particular Mortgage in issue makes much more pointed references to future advances than to past advances. In fact, the word "past" is never used. Liberty's argument is that the term "present" in

the critical Mortgage paragraph 2 refers to loans in existence at the time of the making of the February 22, 1989, loan. This reading is itself not so clear, especially in an adhesion-clause setting.

We therefore conclude that all of the "tests" suggest that the security interest held by Liberty in the Premises should not be extended to the Debtor's indebtednesses of November 21, 1986, and December 22, 1988. In light of the restricted validity that the New Jersey lawmakers and courts have indicated a tendency to allow such clauses, it would be an error to enforce the dragnet clause here. We therefore conclude, with other bankruptcy courts in other contexts, that the dragnet clause in the Mortgage in issue cannot be applied to the above-referenced prior indebtednesses. See In re Bennett, 60 B.R. 48, 51–52 (Bankr.N.D.Ala.1985); Bass, supra, 44 B.R. at 115–16; In re Peterson, 27 B.R. 95, 97 (Bankr.M.D.Fla.1983); and In re Goodman Industries, Inc., 21 B.R. 512, 516–18 (Bankr.D.Mass.1982).

■ The only issue remaining in the process of determining whether the Debtor has an "equity cushion" in the Premises is whether and by how much the value of the Premises exceeds the Mortgage balance. If we were to accept Powell's figure of $711,100 representing the "adjusted valuation to a single purchaser" as the value of the Premises and Liberty's contention that its secured claim on the February 22, 1989, indebtedness alone is $713,300.79, we could find that the Debtor lacks sufficient equity in the Premises to constitute a sufficiently sizable cushion to merit a finding that Liberty is not adequately protected. However, if we were to accept Powell's appraisal figure, we would have to find that the Debtor, at the time of purchase; the other qualified appraisers, hired by and relied upon by Liberty less than a year ago; and Hirsch, the recent prospective purchaser, were all either grossly misinformed regarding the value of the Premises or daft. The previous appraisals, having emanated from Liberty itself "for a different purpose than that at hand, and thus clearly unbiased" are "in the form of an admission," In re

Cole, 81 B.R. 326, 329 (Bankr.E.D.Pa.1988), and hence are entitled to perhaps the most substantial weight in our determination. Accord, In re Blakey, 76 B.R. 465, 467, modified, 78 B.R. 435 (Bankr.E.D.Pa.1987).

■ We therefore conclude that the value of the Premises is at least $900,000, a figure less than that of all of the four above indicators of value other than Powell's "handy" far-lower appraisal. The resultant equity cushion of about $200,000 and almost thirty (30%) percent over Liberty's approximately $700,000 validly secured obligation seems quite sufficient to adequately protect Liberty for a considerable spell. Compare Morysville Body Works, supra, 86 B.R. at 54–58; In re Heath, 79 B.R. 616, 618–19 (Bankr.E.D.Pa.1987); and Grant Broadcasting, 71 B.R. at 386. See generally In re McKillips, 81 B.R. 454, 457–59 (Bankr.N.D.Ill.1987) (collects cases and concludes that an equity cushion of twenty (20%) percent or more constitutes adequate protection).

We recognize that an equity cushion can erode and that beachfront property in Ocean City, New Jersey, may be particularly susceptible to depreciation. However, we doubt that any erosion will take place prior to the 1990 summer season. Our requirement that the Debtors produce a Plan of Reorganization and a Disclosure Statement by March 1, 1990, before the present harsh winter has run its course, assures that very little erosion to the equity cushion presently in place is likely to transpire before the Debtor receives an opportunity to establish, with some certitude, just how bright his prospects for a successful reorganization are.

For all of these reasons, we enter the attached Order, denying Liberty's motion without prejudice and requiring the Debtor to file a Plan of Reorganization and an accompanying Disclosure Statement by March 1, 1990, and to be prepared for a hearing on the latter on March 28, 1990.